## PUBLIC CLEARING HOUSE *v.* COYNE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 224.   Argued April 18, 1904.—Decided May 31, 1904.

The power vested in Congress to establish post offices and post roads embraces the regulation of the entire postal system of the country; Congress may designate what may be carried in, and what excluded from, the mails; and the exclusion of articles equally prohibited to all does not deny to the owners thereof any of their constitutional rights.

Due process of law does not necessarily require the interference of judicial power nor is it necessarily denied because the disposition of property is affected by the order of an executive department.

Each executive department of the Government has certain public functions and duties the performance of which is absolutely necessary to the existence of the Government and although it may temporarily operate with seeming harshness upon individuals; the rights of the public must, in these particulars, overrule the rights of individuals provided there be reserved to them an ultimate recourse to the judiciary.

Where a person is engaged in an enterprise which justifies the Postmaster General in issuing a fraud order, it is not too much to assume that *prima facie* at least all of his letters are identified with the business and § 3929, Rev. Stat., as amended by the act of September 19, 1890, is not unconstitutional because the Postmaster General in seizing and detaining all letters under a fraud order may include some having no connection whatever with the prohibited enterprise.

VOL. CXCIV—32

The rights of the sender, and the addressees of letters returned to the sender under a fraud order issued by the Postmaster General are not affected by the order except so far as the same is a refusal on the part of Congress to extend the facilities of the Post Office Department to the final delivery of the letter, and § 3929, Rev. Stat., as amended, is not unconstitutional and does not operate as a confiscation of the property of the person against whom the order is issued.

The misrepresentation of existing facts is not always necessarily involved in a scheme or artifice to defraud and where, after examination made, the Postmaster General has issued a fraud order on the ground that the defendants were engaged in a scheme for obtaining money or property by means of false representations, and the master in the court below has found that the scheme was, in effect, a lottery, the significant fact is that the parties were engaged in a scheme within the meaning and prohibition of §§ 3929 and 4101, Rev. Stat., and this court will not hold that the Postmaster General exceeded his authority in making the fraud order.

THIS was a bill in equity by the Public Clearing House against the Postmaster of the city of Chicago, praying for an injunction to restrain him from seizing and detaining appellant's mail, stamping it "fraudulent," and returning it to the senders thereof, and from denying to appellant the use of the money order and registered letter system of the Post Office Department.

An answer and replication were filed and the cause referred to a master in chancery to take the testimony and report the same with his conclusions thereon.

The following contains the substance of the master's report:

"1. The complainant is a corporation organized under the laws of the State of Illinois, for the purpose, as stated by its charter, of doing a general brokerage and commission business, collecting and disbursing money and conducting an exchange or information bureau for the benefit of patrons. The evidence shows that the said complainant had made a beginning of several different kinds of business and its managers had opened negotiations with different laundry proprietors, preparing to place laundries on a coöperative basis; also to handle fruits and poultry in the same manner, and also to purchase and sell goods on behalf of its patrons on commission, and to exchange goods in specie in the same manner for a commission,

and had actually transacted some small amount of such business, but the principal business and object for which the said complainant was organized appears to have been to act as the fiscal agent of a certain voluntary association called the League of Equity. This League of Equity consists of a large number of people, approximately five thousand at present, of various occupations and scattered throughout the United States and Canada, each of whom, in his application for membership, consents that the Public Clearing House shall act as fiscal agent for said League of Equity. The said League of Equity was in a way successor to a prior organization called the League of Educators, and this in turn succeeded to a still prior organization called the League of Eligibles, and a certain organization or partnership called the board of managers of the League of Educators and the board of managers of the League of Eligibles were respectively fiscal agents for the two organizations.

"The League of Eligibles was established in the year 1898, and was a voluntary association of unmarried people. Their certificates became matured or realized upon the contingency of marriage, provided that such marriage did not occur within one year from the time when they joined the league. The certificate had a fixed realization value of five hundred dollars, and was paid out of the monthly *pro rata* assessment levied upon all members of the league for the benefit of those members whose certificates were matured or realized.

"The plan of the League of Educators was the same, except that it substituted a fixed time for the realization of the certificates, and eliminated the marriage contingency feature.

"2. The plan of the League of Equity differed from that of the League of Educators only in having a fixed monthly payment of one dollar, instead of a fluctuating or variable assessment. When the first change was made there were about thirteen hundred members of the League of Eligibles, all of whom were given an opportunity to become members of the League of Educators without additional cost and without

losing the benefit of their previous term of coöperation, and
many of them availed themselves of this opportunity and be-
came members of the League of Educators. Again, when the
League of Equity was formed, the League of Educators con-
sisted of some nine thousand members, who were allowed the
same privilege of joining the League of Equity, and up to the
time when the fraud order was issued against the latter concern
between four and five thousand members of the League of
Educators had joined the League of Equity.

"3. The evidence showed that up to about the first of
November, 1902, during the period of the existence of the
League of Eligibles and League of Educators, there had been
collected from about 13,784 members a total of $137,390.66,
out of which the board of managers had taken about $36,000
for their expenses and compensation for themselves and agents
in the field. The remainder had been distributed among some
600 or 700 members, and at that time the board of managers
had no money in their hands.

"In other words, 600 or 700 members had received an
average of something less than $170 each, and over ten thou-
sand members had received nothing.

"4. The board of managers of the League of Educators had
during its business as fiscal agent for said league accumulated
a large number of address cards of different persons through-
out the country, which had been secured through the members
or coöperators, and these address cards were at or about the
time of the organization of the Public Clearing House sold
to said Public Clearing House by the said board of managers,
for the sum of $2,500.

"5. The complainant, The Public Clearing House, as such
fiscal agent of the League of Equity, invites people to join the
said league, and holds out inducements in the shape of a large
return for small amounts of money and for services to be ren-
dered by members or coöperators in inducing others to become
members or coöperators. There is no contract or agreement
issued or entered into with members by the League of Equity.

itself as a body or association, but a certain so-called cooperator's agreement, a copy of which is attached to the bill herein, is issued to each member or coöperator, and is signed by said Public Clearing House by its president and secretary as fiscal agents for the League of Equity.

"In order to carry on successfully the business of the complainant it is necessary that it have the use of the United States mails; but it has not had the use of the mails since November 13, 1902, by reason of a 'fraud order' issued against it, dated November 10, 1902, by the Postmaster General, and as a result the business has practically been stopped.

"6. The plan or scheme of the League of Equity as set forth in the coöperator's agreement and in other literature issued by said complainant may be briefly stated as follows: Each person who becomes a member or coöperator pays three dollars as enrollment fee, and agrees to pay the sum of one dollar per month for sixty months or five years, and also agrees to 'coöperate' by inducing other persons to become members or coöperators. The agreement states that in consideration of said enrollment fee 'and the faithful compliance with the terms of this agreement hereinafter contained, the above-named person shall receive his *pro rata* share of the total amount realized (less ten per cent) when entitled to a realization as hereinafter provided, said realization to be in accordance with the following ordinary causation and realization table.' Then follows a table showing that if the league grows at the rate of fifteen to one the total realization of the member at the end of five years will be at the same rate of increase, that is, he will receive nine hundred dollars for his sixty dollars paid in; if the growth is at the rate of ten to one he will receive six hundred dollars at the end of five years, and so forth and so on down to a growth of only one to one, in which case he will receive only his money back, less the ten per cent which is in each case deducted as the compensation of the complainant for its services and existence as fiscal agent, and less also the three dollars enrollment fee. Aside from this

ten per cent and the three dollars enrollment fee, the plan does not contemplate that complainant shall retain any of the money paid in by coöperators, or that any reserve fund shall be accumulated or invested, but that the money paid in each month shall be regularly paid out each month (less ten per cent) to the so-called realizing coöperators, *i. e.*, those whose five years' period has expired and who have continued to make the requisite monthly payments during said five years. There is an additional provision that each coöperator who shall have secured three new members in any one year may realize or receive at the end of each year one-fifth of the amount which he would be entitled to receive at the end of five years, assuming that the growth for the five years continued at the same rate; but the plan contemplates that in the end the member who secures new members and the one who does not shall receive the same amount.

"5. All members who join the League of Equity during the same month constitute a class by themselves and are entitled to realize in all respects precisely the same amount and at the same time, excepting the member who obtains new coöperators may receive his realization in yearly installments, instead of in one lump at the end of the five years', period.

"The only source of income to the league and the only funds to which its members can look for payment of the promised amount, or any amount whatever, is the fund created each month by the payment of monthly dues, and the realization of any amount whatever by the new members is conditioned absolutely upon the constant acquisition of other new members and the new payments to be made by such new members. And what amount the members or coöperators will realize, as is stated by the league literature, depends entirely upon the ratio of growth of the league. · No reserve fund is accumulated and no investments whatever are made of any portion of the money paid in by members."

Upon this state of facts the master came to the conclusion that the scheme of the complainant was, in effect, a lottery,

and as such was not entitled to the use of the mails, and also reported to the court that the fraud order which had been issued by the Postmaster General in November, 1902, was fully justified and that the injunction should be denied. His action was affirmed by the Circuit Court, and the bill dismissed for the want of equity.

*Mr. D. I. Sicklesteel* for appellant:

The appellant challenges the constitutionality of the statutes above set forth, which authorize the Postmaster General "upon evidence satisfactory to him," and which do not provide for any trial, hearing or inquiry of any kind, to arbitrarily seize the honest mail of any citizen of the United States as alleged in the bill, and to interdict and prohibit its receiving any mail, to destroy its business, and its property and property rights, and to subject its papers and sealed packets to unreasonable searches and seizures. 4th, 5th, 14th Amendments and § 8, Art. I of the Constitution; *Chicago, M. & St. P. Ry. Co.* v. *Minnesota*, 134 U. S. 418; *Boyd* v. *United States*, 116 U. S. 616; *Murray's Lessees*, 18 How. 276; *In re Zeibold*, 23 Fed. Rep. 791; *Palairets's Appeal*, 67 Pa. St. 49; *Hoover* v. *McChesney*, 81 Fed. Rep. 472; *Fairfield Floral Co.* v. *Bradbury*, 87 Fed. Rep. 411; *United States* v. *Rider*, 50 Fed. Rep. 406; *United States* v. *Keokuk & H. B. Co.*, 45 Fed. Rep. 178; *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94.

The master and the court confirming his report have found that appellant, its officers and agents "have not been guilty of making false or fraudulent misrepresentations in order to induce persons to become members of the league, but that full opportunity has been given for all persons to become fully conversant with the details and workings of the league's system."

Even if these statutes are constitutional, yet the appellant corporation, from the facts as proven at the trial and found by the court, is not as a matter of law, engaged "in conducting any lottery, gift enterprise or scheme for the distribution of money or of any real or personal property, by lot, chance or

drawing of any kind" within the meaning of said statutes, and
the Postmaster General having assumed and exercised juris-
diction in a case not covered by said statutes, and having
acted outside of the scope of the said statutes, the injunction
prayed for should have been granted in any event. The Mas-
ter's findings were confirmed by the court. Bouvier Law Dict.;
Webster's Dict.; *United States* v. *Olney,* 1 App. (U. S.) 278;
Deady (U. S.), 461; *Horner* v. *United States,* 147 U. S. 458;
*United States* v. *Politzer,* 59 Fed. Rep. 276; *People* v. *Elliott,* 74
Michigan, 264; *Ex parte Kameta,* 36 Oregon, 251; *Meyer* v. *State,*
112 Georgia, 20; *State* v. *Kansas Merc. Assn.,* 45 Kansas, 231;
*State* v. *Boneil,* 42 La. Ann. 1112; *Barclay* v. *Pearson* (1893),
2 Chy. 154; *Taylor* v. *Smeaton,* 11 Q. B. D. 210; *State* v. *Clark,*
66 Am. Dec. 723; *McDonald* v. *United States,* 63 Fed. Rep. 426,
affirming *S. C.,* 59 Fed. Rep. 565; *Lynch* v. *Rosenthal,* 144
Indiana, 90; *United States* v. *Wallis,* 58 Fed. Rep. 942; *United
States* v. *Fulkerson,* 74 Fed. Rep. 627; *State* v. *Interstate Invest-
ment Co.,* 60 N. E. Rep. 220; 14 Am. & Eng. Ency. of Law,
2d ed. 600; *Dunn* v. *People,* 40 Illinois, 465; *Thomas* v. *People,*
59 Illinois, 160; *Elder* v. *Chapman,* 176 Illinois, 142, p. 150,
overruling *Elder* v. *Chapman,* 70 Ill. App. 293; *Wilkinson* v.
*Gill,* 74 N. Y. 67; 23 Att. Gen. Op. 263.

The appellee not having excepted to any of the findings of
the master and the court, the report of the said master, as
confirmed by the court is absolutely binding upon him and
precludes appellee from now raising the question in this court
as to the correctness of the finding of the Postmaster General,
set forth in the fraud order complained of.

*Mr. Assistant Attorney General Purdy,* with whom *Mr. Wil-
liam A. Day,* Assistant to the Attorney General, was on the
brief, for appellee.

Mr. Justice Brown, after making the foregoing statement,
delivered the opinion of the court.

By section 3929 of the Revised Statutes, as amended by the

act of September 19, 1890, 26 Stat. 465, "The Postmaster General may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enterprise, or scheme for the distribution of money, or of any real or personal property by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations or promises, instruct postmasters at any post-office at which *registered* letters arrive directed to any such person or company . . . to return all such registered letters to the postmaster at the office at which they were originally mailed, with the word 'Fraudulent' plainly written or stamped upon the outside thereof."

By section 4041, the Postmaster General is authorized in similar terms to forbid the payment by any postmaster of any postal money order drawn in favor of any person engaged in the prohibited business; and by section 4 of the act of March 2, 1895, 28 Stat. 963, the power thus conferred upon the Postmaster General by the preceding section, 3929, is extended and made applicable to *all* letters or other matter sent by mail.

These acts apply to two classes of cases: First, to schemes for the distribution of money, etc., by lot, chance or drawing of any kind; second, to all schemes or devices for obtaining money or property of any kind by means of false or fraudulent pretenses, representations or promises.

It seems the Postmaster General, in issuing the fraud order in this case, acted upon the theory that the complainant was engaged in conducting a scheme or device for obtaining money through the mails by means of false and fraudulent pretenses, etc., and not in conducting a lottery; but if the order detaining the letters was properly issued, in view of all the evidence introduced in the court below, we do not think it was vitiated by the fact that the Postmaster General acted upon the hypothesis that the business in which complainant was engaged

was a fraudulent scheme instead of a lottery, since both are within the purview of these statutes.

We find no difficulty in sustaining the constitutionality of these sections. The postal service is by no means an indispensable adjunct to a civil government, and for hundreds, if not for thousands, of years the transmission of private letters was either entrusted to the hands of friends or to private enterprise. Indeed, it is only within the last three hundred years that governments have undertaken the work of transmitting intelligence as a branch of their general administration. While it has been known in this country since colonial times and was recognized in the Constitution and in some of the earliest acts of Congress, the rates of postage were so high and the methods of transmission so slow and uncertain that it was not until 1845, when the postage was reduced to five and ten cents, according to the distance, and a stamp or stamps introduced, that it assumed anything of the importance it now possesses.

It is not, however, a necessary part of the civil government in the same sense in which the protection of life, liberty and property, the defence of the government against insurrection and foreign invasion, and the administration of public justice are; but is a public function assumed and established by Congress for the general welfare, and in most countries its expenses are paid solely by the persons making use of its facilities; and it returns, or is presumed to return, a revenue to the government, and really operates as a popular and efficient method of taxation. Indeed, this seems to have been originally the purpose of Congress. The legislative body in thus establishing a postal service may annex such conditions to it as it chooses.

The constitutional principles underlying the administration of the Post Office Department were discussed in the opinion of the court in *Ex parte Jackson*, 96 U. S. 727, in which we held that the power vested in Congress to establish post offices and post roads embraced the regulation of the entire postal system

of the country; that Congress might designate what might be carried in the mails and what excluded, and that in the enforcement of such regulations a distinction was made between letters and sealed packages subject to letter postage, and such other packages as were open to inspection, such as newspapers, magazines, pamphlets and other printed matter, and that the constitutional guarantee against unreasonable searches and seizures extended to letters but did not extend to printed matter. In establishing such system Congress may restrict its use to letters, and deny it to periodicals; it may include periodicals, and exclude books; it may admit books to the mails and refuse to admit merchandise, or it may include all of these and fail to embrace within its regulations telegrams or large parcels of merchandise, although in most civilized countries of Europe these are also made a part of the postal service.   It may also refuse to include in its mails such printed matter or merchandise as may seem objectionable to it upon the ground of public policy, as dangerous to its employés or injurious to other mail matter carried in the same packages. The postal regulations of this country, issued in pursuance of act of Congress, contain a long list of prohibited articles dangerous in their nature, or to other articles with which they may come in contact, such, for instance, as liquids, poisons, explosives and inflammable articles, fatty substances, or live or dead animals, and substances which exhale a bad odor. It has never been supposed that the exclusion of these articles denied to their owners any of their constitutional rights. While it may be assumed, for the purpose of this case, that Congress would have no right to extend to one the benefit of its postal service, and deny it to another person in the same class and standing in the same relation to the Government, it does not follow that under its power to classify mailable matter, applying different rates of postage to different articles, and prohibiting some altogether, it may not also classify the recipients of such matter, and forbid the delivery of letters to such persons or corporations as in its judgment are making

use of the mails for the purpose of fraud or deception or the dissemination among its citizens of information of a character calculated to debauch the public morality. For more than thirty years not only has the transmission of obscene matter been prohibited, but it has been made a crime, punishable by fine or imprisonment, for a person to deposit such matter in the mails. The constitutionality of this law we believe has never been attacked. The same provision was by the same act extended to letters and circulars connected with lotteries and gift enterprises, the constitutionality of which was upheld by this court in *In re Rapier*, 143 U. S. 110.

It is contended, however, that the laws in question are unconstitutional in that they authorize the Postmaster General to seize and return to sender all letters addressed to a particular person, firm or corporation which he is satisfied is making use of the mail for an illegal purpose. Their constitutionality is attacked upon three grounds: First, because they provide no judicial hearing upon the question of illegality; second, because they authorize the seizure of all letters without discriminating between those which may contain and those which may not contain prohibited matter; and, third, because they empower the Postmaster General to confiscate the money, or the representative of money, of the addressee, which has become his property by the depositing of the letter in the mails.

1. It is too late to argue that due process of law is denied whenever the disposition of property is affected by the order of an executive department. Many, if not most, of the matters presented to these departments require for their proper solution the judgment or discretion of the head of the department, and in many cases, notably those connected with the disposition of the public lands, the action of the department is accepted as final by the courts, and even when involving questions of law this action is attended by a strong presumption of its correctness. *Bates & Guild Co.* v. *Payne*, 194 U. S. 106. That due process of law does not necessarily require the interference of the judicial power is laid down in many cases and

by many eminent writers upon the subject of constitutional limitations. *Murray's Lessee* v. *Hoboken Co.*, 18 How. 272, 280; *Bushnell* v. *Leland*, 164 U. S. 684. As was said by Judge Cooley, in *Weimer* v. *Bunbury*, 30 Michigan, 201: "There is nothing in these words, ('due process of law,') however, that necessarily implies that due process of law must be judicial process. Much of the process by means of which the government is carried on and the order of society maintained is purely executive or administrative. Temporary deprivations of liberty or property must often take place through the action of ministerial or executive officers or functionaries, or even of private parties, where it has never been supposed that the common law would afford redress." If the ordinary daily transactions of the departments, which involve an interference with private rights, were required to be submitted to the courts before action was finally taken, the result would entail practically a suspension of some of the most important functions of the government. Even in the recent case of the *School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, the constitutionality of the law authorizing seizures of this kind by the Postmaster General was assumed, if not actually decided, the only reservation being that the person injured may apply to the courts for redress in case the Postmaster General has exceeded his authority or his action is palpably wrong. So, too, in the recent case of *Bates & Guild Co.* v. *Payne*, 194 U. S. 106, the law was also assumed to be constitutional, the only doubtful question being whether this court should accept the findings of the Postmaster General as to the classification of the mail matter as final under the circumstances of the case. Inasmuch as the action of the postmaster in seizing letters and returning them to the writers is subject to revision by the judicial department of the Government in cases where the Postmaster General has exceeded his authority under the statute, *School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, we think it within the power of Congress to entrust him with the power of seizing and detaining

letters upon evidence satisfactory to himself, and that his action will not be reviewed by the court in doubtful cases.

2. Nor do we think the law unconstitutional, because the Postmaster General may seize and detain all letters, which may include letters of a purely personal or domestic character, and having no connection whatever with the prohibited enterprise. In view of the fact that by these sections the postmaster is denied permission to open any letters not addressed to himself, there would seem to be no possible method of enforcing the law except by authorizing him to seize and detain all such letters. It is true it may occasionally happen that he would detain a letter having no relation to the prohibited business; but where a person is engaged in an enterprise of this kind, receiving dozens and perhaps hundreds of letters every day containing remittances or correspondence connected with the prohibited business, it is not too much to assume that, *prima facie* at least, all such letters are identified with such business. A ruling that only such letters as were obviously connected with the enterprise could be detained would amount to practically an annullment of the law, as it would be quite impossible, without opening and inspecting such letters, which is forbidden, to obtain evidence of the real facts. *Powell* v. *Pennsylvania,* 127 U. S. 678, 685; *Lawton* v. *Steele,* 152 U. S. 133. Whether, in case a private registered letter was thus seized and detained, and damage was thereby occasioned to the addressee, an action would lie against the Postmaster General, is not involved in this case. It certainly is not made the basis of the present suit.

Another answer to this argument, which seems to be conclusive, is that the fraud order in this case is not open to this objection, as the Postmaster General only forbids the postmaster at Chicago to pay any postal money orders, drawn to the order of the League of Equity and the Public Clearing House, or their officers or agents in their capacity as such, and to inform the remitter of any such postal money order that payment thereof has been forbidden, etc., and "to return all

letters, whether registered or not, or other mail matter which shall arrive at your office directed to such concerns or their officers or agents as such, to postmasters at the office at which they were originally mailed." There is nothing in the order thus worded that would authorize the postmaster at Chicago to return letters addressed to an individual unless addressed to such individual as officer or agent of the League of Equity of the complainants. There is nothing in this order that would authorize the interference with the private or domestic mail matter of individuals.

3. The objection that the Postmaster General is authorized by statute to confiscate the money, or the representative of money, of the addressee, is based upon the hypothesis that the money or other article of value contained in a registered letter becomes the property of the addressee as soon as the letter is deposited in the post office. The action of the Postmaster General in seizing the letter does not operate as a confiscation of the money, or the determination of the title thereto; but merely as a refusal to extend the facilities of the Post Office Department to the final delivery of the letter. Congress might undoubtedly have authorized the postmaster at the depositing office to decline to receive the letter at all if its forbidden character were known to him; but as this would be impossible, we think the power to refuse the facilities of the department to the transmission of such letter attends it at every step from its first deposit in the mail to its final delivery to the addressee, and as the character of the letter cannot be ascertained until it arrives at the office of delivery, the Government may then act and refuse to consummate the transaction. If the letter and its contents become the property of the addressee when deposited in the mail, the subsequent seizure by the Government would not impair his title or prevent an action by him for the amount of the remittance. True, this might be of no practical value to him, but it is a sufficient reply to show that the title to the letter did not change by its seizure by the postmaster.

4. .The main question involved in this case, however, is whether the scheme of the complainant was within the language of sections 3929 and '4041. The Postmaster General, in his fraud order, a copy of which is found in the bill, assumed that .the League of Equity and the Public Clearing House were engaged in conducting a scheme for obtaining money by means of false and fraudulent representations or promises, but as the master found in his report that the Clearing House and its officers had dealt fairly and honestly' in respect to the collection and distribution of funds collected by them, and had not been guilty of false or fraudulent representations in order to induce persons to become members of the League, this theory was abandoned by the Government, and the case put upon the ground that these corporations were engaged in conducting a "lottery or scheme for the distribution of money  . . . by lot, chance, or drawing." That they were not engaged in conducting a lottery in the sense in which that word is ordinarily used is entirely clear, since this involves fixed prizes and the allotment of the prizes to the holder of numbered tickets which are drawn from a box. In such case the word lot or chance attaches only to the name or number of the ticket drawn, and not to the amount of the prize, but the statute covers any scheme for the distribution of money by lot or chance, as well as by drawing, and by the word chance, as defined by Webster, is meant "something that befalls, as the result of unknown or unconsidered forces; .the issue of uncertain conditions; an event not calculated upon; an unexpected occurrence; a happening; accident, fortuity, casualty." As stated by the master, the plan contemplates that each person who becomes a member or coöperator pays three dollars as enrollment fee, and agrees to pay the sum of one dollar per month for sixty months or five years; and also agrees to coöperate by inducing other members or persons to become coöperators, shall receive his *pro rata* share of the total amount realized when entitled to a "realization" as provided at the end of five years; or in case he shall have secured three new

members in any one year, he may realize or receive at the end of each year one-fifth of the amount which he would be entitled to receive at the end of five years, assuming that the growth of the five years continued at the same rate. The plan also contemplates that in the end the member who secures new members, and the one who does not, shall receive the same amount. All members joining the league during the same month constitute a class by themselves and are entitled to realize in all respects precisely the same amount and at the same time, excepting the member who obtains new cooperators may receive his realization in yearly installments instead of in one lump at the end of the five years' period.

We do not consider it necessary to enter into the details of the plan, which is a somewhat complicated one, and the success of which obviously depended upon constantly and rapidly increasing the number of subscribers or coöperators. The only money paid in was a small enrollment fee of three dollars and a monthly payment of one dollar for five years. The return to the subscribing member, which is called a realization, is not only uncertain in its amount, but depends largely upon the number of new members each subscriber is able to secure, as well as the number of members which his coöperators are able to secure. The return to members who have been able to secure a large number of other members, and to pay their own monthly dues, may be very large in comparison with the amount paid in, but the amount of such return depends so largely, and indeed almost wholly, upon conditions which the member is unable to control, that we think it fulfills all the conditions of a distribution of money by chance. In becoming a coöperator each new member evidently contemplates that a large number, probably a large majority, of those subscribing will drop out before the end of five years. That some will and some will not induce others to become members, and that the amount ultimately realized depends not only upon his own prompt payment of dues and his own exertions, but upon a corresponding action by other

coöperators. One thing, however, is entirely clear, and that is, the success of the scheme depends wholly upon the ability of the members to increase the number of subscribers, and, as there is no reserve fund provided for their indemnification, there is sure to be a loss to every one interested in the enterprise as soon as the number of new members ceases to increase.

Counsel for complainant liken the scheme to that of an ordinary life insurance company, which at an early date was thought by some to involve the elements of chance, but was finally held to be a legitimate business. In such policies there is the payment of a fixed sum which matures either at the death of the assured or upon the happening of some other contingency expressly provided for in the policy. There is no uncertainty as to the amount to be paid, as in this case, nor does it depend upon the conduct of other persons insured in the same company, but simply upon payment of premiums by insured. The only contingency is the time as to when the policy is to mature, and the profits are calculated upon the theory that the premiums paid, with the interest thereon, will in the end amount to more than the sum becoming due upon the happening of the contingency. There is also a reserve fund provided for the security of policy holders in case no new applications are made for insurance or the business of the company is abandoned. As the only funds provided in this scheme are small monthly payments which are constantly being divided in the shape of monthly realizations, there is no possibility of a reserve fund for the security of the coöperators. The uncertainty of the amount realized upon these settlements is evident from the fact that while a member may possibly realize as high as fifteen dollars for every dollar invested by him, he may realize no profit at all, or, in case the business is suspended may realize nothing.

In the careful and satisfactory report of the master the plan of the complainant is briefly described "as a plan for securing money from a constantly increasing large number, for the benefit of a constantly increasing smaller number; with an

absolute certainty that when the enterprise reaches an end for any reason the large number will lose every dollar they have put into it, and in the meantime the smaller number will have realized such amounts as may have resulted from the growth of the larger number; but no one can predict what that growth will be."

It is true, as urged by the counsel for complainant, that in investing money in any enterprise the investor takes the chance of small profits, or even of failure, as well as the hope of large profits; but such enterprises contemplate the personal exertions of the investor, or of his partners, agents or employés, while in the present case his profits depend principally upon the exertions of others, over whom he has no control and with whom he has no connection. It is in this sense the amount realized is determinable by chance.

The scheme lacks the elements of a legitimate business enterprise, and we think there was no error in holding it to be a lottery within the meaning of the statute. Indeed, we think that no scheme of investment which must ultimately and inevitably result in failure can be called a legitimate business enterprise. The cases upon the subject of the definition of a lottery are carefully collated and criticised by Mr. Justice Blatchford in *Horner* v. *United States,* 147 U. S. 449, 458, and are held to extend to all schemes for the distribution of prizes by chance, such as policy playing, gift exhibitions, prize concerts, raffles at fairs, etc., and various forms of gambling.

That the party injured has a right to invoke the judicial power of the Government whenever his property rights have been invaded by the exercise of such power, was settled by this court in *Noble* v. *Union River Logging Railroad,* 147 U. S. 165, as well as in the *McAnnulty* case. But as already indicated, it would practically arrest the executive arm of the Government if the heads of departments were required to obtain the sanction of the courts upon the multifarious questions arising in their departments, before action were taken, in any matter which might involve the temporary disposition of private

property. Each executive department has certain public functions and duties, the performance of which is absolutely necessary to the existence of the Government, but it may temporarily, at least, operate with seeming harshness upon individuals. But it is wisely indicated that the rights of the public must in these particulars override the rights of individuals, provided there be reserved to them an ultimate recourse to the judiciary.

In the view we have taken of this case, and of the action of the court below, as well as of the course of the argument here, we have not found it necessary to inquire whether the action of the Postmaster General in basing his fraud order upon the theory that the defendants were engaged in a scheme for obtaining money or property by means of false representations, was sustainable or not. As already stated, the master found that there had been no false representations of existing facts and no unfair dealing with the coöperators; yet, as we held in *Durland* v. *United States*, 161 U. S. 206, the misrepresentation of existing facts is not necessary to a conviction under a statute applying to "any scheme or artifice to defraud." As was observed by Mr. Justice Brewer, (p. 313,) "Some schemes may be promoted through mere representations and promises as to the future, yet are none the less schemes and artifices to defraud. . . . In the light of this the statute must be read, and so read it includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future. The significant fact is the intent and purpose." But, notwithstanding this question, we are satisfied the Postmaster General did not exceed his authority in making the order in this case, and the judgment of the court below is therefore

*Affirmed.*

MR. JUSTICE BREWER, MR. JUSTICE WHITE and MR. JUSTICE HOLMES concurred in the result.

MR. JUSTICE PECKHAM dissented.