**ELLIOTT WORKS, Inc., et al. v. FRISK.**
No. 4471.

District Court, S. D. Iowa, Central Division.
Feb. 17, 1932.

Charles W. Lyon and Homer M. Lyon, both of Des Moines, Iowa, for complainants.

Ross R. Mowry, U. S. Atty., for respondent.

DEWEY, District Judge.

On January 12, 1932, there was issued by the Postmaster General to Edwin J. Frisk, postmaster at Des Moines, Iowa, an order, which is known as a fraud order, as against the Elliott Works, Incorporated, and H. S. Elliott, president, of Des Moines, Iowa, advising that the said corporation and its president should be forbidden the use of the United States mails and that all letters and other mail matter at the post office at Des Moines, Iowa, directed to the said concern and party, should be returned to the senders thereof marked, "Fraudulent."

On January 15, 1932, the Elliott Works, Inc., and H. S. Elliott, as complainants, filed a bill in equity in this court as against Edwin J. Frisk, postmaster at Des Moines, Iowa, defendant, asking that he be enjoined from carrying out said order of the Postmaster General on the ground that the Postmaster General in his findings and order acted beyond his jurisdiction, as there was an absence of any competent and legal evidence before him to sustain such an order, and because in the issuance of said fraud order the Postmaster General had acted arbitrarily and in violation of the power conferred upon him by sections 259 and 732 of title 39, U. S. C., 39 USCA §§ 259, 732 (sections 3929 and 4041, Revised Statutes).

Upon presentation of the verified petition a restraining order was issued by this court until a hearing could be had on the temporary injunction, which hearing was ordered to be had by affidavits on the 25th day of

January, 1932, but was later continued until the 6th day of February, 1932, at which time hearing was had on the application for a temporary injunction as against the defendant, Edwin J. Frisk, postmaster at Des Moines, Iowa, and the cause submitted.

At said hearing the respondent offered a transcript of certain evidence taken at the hearing in Washington, D. C., before the representative of the Postmaster General (the solicitor of the Post Office Department, Mr. Horace J. Donnelly), and certain affidavits concerning the evidence taken at that hearing. The complainants filed and submitted affidavits likewise, but, unless otherwise referred to herein, they were evidence of witnesses as to the merits of the controversy had at the hearing before the Postmaster General and cannot be considered by this court as evidence, under the law which is hereinafter set forth. This court is not acting as a court of review but only on the question of whether or not the Postmaster General in the hearing and the execution of the fraud order acted arbitrarily and whether the order was issued in the absence of any evidence to sustain it, or whether the order as issued was induced by any other error of law, as set forth by complainants in their petition to this court.

It appears from the affidavits and evidence submitted that there had been an investigation by the Post Office Department on complaints to the effect that complainants herein were using the mails to defraud in violation of sections 259 and 732, title 39, U. S. Code (39 USCA §§ 259, 732), and that this investigation warranted a hearing; that a memorandum of charges setting forth that the complainants herein were engaged in the carrying on of a scheme which was fraudulent was filed, and the solicitor of the Post Office Department issued a notice to complainants of said memorandum of charges with an order to show cause on a certain date why a fraud order should not be issued against them; that on or about September 16, 1931, the complainants in this case appeared before the solicitor of the Post Office Department, accompanied by their counsel and certain witnesses, and a hearing was had on September 16th, 17th, 18th, 19th, and 21st, inclusive; that following the hearing a memorandum for the Postmaster General was filed embodying a finding of fact and recommending the issuance of a fraud order, and it was upon this finding of fact and recommendation that the fraud order was issued by the Postmaster General. The said memorandum pre-

pared by Solicitor Horace J. Donnelly indicates a careful consideration of the evidence introduced at the hearing before him. In order that the position of the government and the facts found by the solicitor may be presented, they are set out in part as follows:

"* * * The respondents (Elliott Works, Inc., and H. S. Elliott, president) are engaged in advertising and selling through the mails a preparation called 'Nu-Life,' claiming for it many extraordinary virtues as a battery trouble eliminant. * * * The body of the text of this circular contains the following statements: * * *

"Actual Tests Prove that Nu-Life

"1. Charges Batteries with surprising power instantly.

"2. Makes old batteries work like new.

"3. Retains charge of batteries indefinitely.

"4. Saves the cost of new batteries.

"5. Makes dead batteries have new life.

"6. Prevents corroding of batteries and terminals.

"7. Adds power to automobiles and radios.

"8. Makes starting easier.

"9. Makes lights brighter.

"10. Prevents overcharging.

"11. Doubles life of old and new batteries.

"12. Makes expensive charging of batteries unnecessary.

"13. Saves disagreeable, dirty battery work.

"14. Makes money, time and joy.

"15. Makes cold weather driving a pleasure.

"16. Prevents battery plates from ever sulphating.

"17. Eliminates high rental and charging expense.

"18. Prevents batteries from freezing.

"19. Makes adding water over twice a year unnecessary."

"* * * At the heading of this advertisement (one published in newspapers), is a picture showing a magician or conjurer holding a wand in his hand and pouring a fluid into a large storage battery to the accompaniment of great electrical activity as indicated by certain zig-zag lines radiating from the battery and the title: 'PRESTO Just Like Magic NU-LIFE did it,' and various statements scattered around the illustration in proximity to the zig-zag lines. These statements read as follows: 'Saves cost of new batteries,' 'It makes battery rental unnecessary,' 'Retains charge in-

definitely,' 'It makes old batteries work like new,' 'It adds power and pep to autos and radios,' 'Doubles life of batteries,' 'It ends sulphation, freezing and overcharging,' 'Charge new and old batteries instantly.' As a general sub-caption to the above is the one, 'Charge batteries with surprising power instantly.' "

" * * * The evidence shows that the preparation 'Nu-Life is composed of the following:

"Magnesium sulphate (epsom salts) 72.6.

"Potassium alum 19.3.

"Glauber's salt 8.4.

"In addition to the above there is a small quantity of organic coloring matter. The small quantities of these chemicals, which are mixed in a package of 'Nu-Life' weighing about 5 ounces, may be purchased in a drug store for a few cents. The respondents fix $3.00 as the price for each package, but make what they call a special free sample offer of two packages for $3.00, one of these packages being described as a free sample." •

"A circular of instructions accompanying the preparation, which instructions are not furnished until after the receipt of the customer's money, reads as follows: Directions for Using 'Nu-Life' * * * Directions for Servicing Older Batteries * * * Directions for Radio Batteries * * * For Best Results * * * Important * * * "

"One of the representations is that 'Nu-Life' charges batteries instantly. The evidence shows that this representation is untrue. As defined by the American Institute of Electrical Engineers, and as understood by electrical technicians, the word 'charge' signifies the conversion of electrical energy into chemical energy within a cell or storage battery, etc. * * * "

"Carefully conducted tests of 'Nu-Life' were made at the request of this Department by the United States Bureau of Standards. In making these tests the directions for using the preparation furnished by the respondents were followed. In each case one cell of the battery in which the preparation was used was permitted to remain free from 'Nu-Life,' and the tests show no significant difference between the treated and the untreated cells as to any increase in electrical energy, capacity, specific gravity of the electrolyte, or the amount of usable electrical energy delivered by the battery before and after treatment. The evidence shows that 'Nu-Life' did not charge these batteries instantly, nor did

it enable them to take a charge instantly, nor did it charge the battery at all.

"Paragraph eight of the instructions which accompany 'Nu-Life' states that 'A Nu-Life treated battery can be tested only with a boltmeter and not with a hydrometer.' The evidence shows that the specific gravity of the electrolyte in a battery is a prime indication of the amount of charge contained in it, and that when batteries are charged by passing through them a current of electricity, the amount of charge is determined by a hydrometer test showing the specific gravity of the electrolyte which increases in direct ratio to the amount of electrical energy stored in the battery until it reaches a fully charged condition. The above mentioned tests showed that the addition of 'Nu-Life' to the electrolyte in battery cells did not affect its specific gravity as compared to the electrolyte in untreated cells, and it was admitted by a witness for the respondent that the only specific gravity increase noted by him ranged from .04 to .08 of a point. He further admitted that that in itself would not be a good indication. The evidence shows that a battery in a discharged condition which has a low specific gravity is usually raised to a reading between 1200 and 1300 when charged by means of an electrical current. This result is not accomplished by treating a battery with 'Nu-Life,' nor does any significant increase of specific gravity follow such treatment."

" * * * Despite the fact that respondents' attention had been called to the misleading character of the above statement (phrase 'Charges Batteries Instantly') in their advertising, they continued to use it. * * * "

"The evidence further shows that 'Nu-Life' does not make old batteries work like new, as represented. In order to accomplish this result it would be necessary to restore the original or initial ampere hour capacity of the battery. The tests conducted by the Bureau of Standards show that this is not accomplished by the addition of 'Nu-Life' to the electrolyte in storage battery cells.

"According to the testimony a battery which is in the condition commonly referred to by the storage battery trade as 'dead,' or has not yet reached that condition but is in a run-down, worn, and unsatisfactory state due to much use or abuse, need not necessarily contain an abnormal amount of sulphation. Its low degree of efficiency may be due to warped or broken separators between the plates, warped plates, mechanical shorts or

other defects which can be remedied only by reconstructing the battery or replacing the defective portions thereof. Any attempt to restore the usefulness of such a battery by treatment with 'Nu-Life' would signally fail in its purpose.

"The evidence shows that the representation in the respondents' literature that 'Nu-Life' retains charge of battery indefinitely, is false. Witnesses for respondents would not support this representation unqualifiedly, etc. * * *"

"A witness connected with the business testified that if the battery retained the charge only a few hours, that such length of time meant 'indefinitely' to the promoters.

"With respect to the representation that the use of 'Nu-Life' in a battery makes adding of water more than twice a year unnecessary, the tests conducted by the Bureau of Standards show that treating a battery with 'Nu-Life' does not in any way affect the amount of water which it may be necessary to add to the electrolyte from time to time in order to keep it above the top of the plates. The evidence further shows that the concern employed by respondents to make tests, by letter of January 13, 1931, advised them:

" 'We ran several experiments to show that battery fluid after being treated with Nu-Life had a lower evaporation rate. But these experiments showed no practical advantage.'

"Among the many false and fraudulent statements contained in respondents' advertising is one to the effect that the use of 'Nu-Life' prevents sulphation. * * *"

"Testimony at the hearing shows that if, as the respondents' literature claims, 'Nu-Life' were capable of preventing sulphation, it would simply mean that the reversibility of the battery in which it was used would be destroyed and that the battery would no longer be useful as a storage battery.

"The evidence shows that it is possible for persons purchasing this preparation to be deluded into the belief that they have by its use revived or rejuvenated a battery which they believed to be dead but which was not in fact in that condition. * * *"

"The evidence shows that representations in respondents' literature other than those set forth in the memorandum of charge herein are also false and fraudulent. It has been shown that 'Nu-Life' will not make a battery last indefinitely because there are many factors which enter into and govern the useful life of the battery upon which it is admitted

by respondents 'Nu-Life' could have no influence. Neither can 'Nu-Life make dead batteries have new life.' Nor does it add power to automobiles and radios or double the life of old or new batteries, or save disagreeable battery work or prevent battery plates from ever sulphating, as stated in the advertisements of respondents..

"The evidence shows and I so find that this is a scheme for obtaining money through the mails by means of false and fraudulent pretenses, representations and promises.

"I therefore recommend that a fraud order be issued against the concern and party named in the caption of this memorandum.

"[Signed]   Horace J. Donnelly,
"Solicitor."

Counsel have prepared extensive and comprehensive briefs on the law governing the question of the rights of the judiciary to consider and act upon fraud orders issued by the Postmaster General. There is little, if any, controversy between the parties as to the law governing this court in this proceeding. Judge Sanborn, in the case of People's United States Bank v. Gilson (C. C. A.) 161 F. 286, 289, has so fully digested the opinions of the United States Supreme Court and the other courts of last resort that the citation of other cases is not necessary. He analyzes the findings of the Supreme Court of the United States in the case of American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 S. Ct. 33, 47 L. Ed. 90, and, as complainants herein rely principally upon this case, the findings of Judge Sanborn as to what this case determines may be set out, as follows: "The Supreme Court held (1) that, where the beneficial effect of the scheme or device in question as in that case is a matter of opinion not susceptible of proof as an ordinary fact, the Postmaster General has no lawful jurisdiction or authority to issue a fraud order * * *;   (2) that, where the Postmaster General is induced to issue a fraud order by an error of law, his action is reviewable, and the execution of his order may be enjoined by the courts * * *; (3) that if there is no evidence before the Postmaster General of the violation of the federal law, or if the admitted, conceded, or established facts before him show no such violation, the Postmaster General's determination that the evidence of such violation is satisfactory to him and his issue of a fraud order thereon is a pure mistake of law remediable by the courts * * *; and (4) that, where the Postmaster General issues a fraud order without jurisdiction or by reason

of an error of law, and thereby stops the delivery of letters which contain valuable inclosures, he violates the property rights of the person or company whose letters are thus withheld. * * * "

Judge Sanborn, also commenting on the case of Public Clearing House v. Coyne, 194 U. S. 497, 24 S. Ct. 789, 48 L. Ed. 1092, says: "A significant fact in this case is that the Supreme Court affirmed the review by the lower court of the Postmaster General's finding of fact, approved its reversal of that finding, and declared that such a review would not be made in doubtful cases, but only when his finding was 'palpably wrong.' * * * In a doubtful case within his jurisdiction in the absence of fraud or a gross mistake of fact, where there is some evidence which is satisfactory to the Postmaster General to sustain a fraud order, his decision of the question of fact upon which the order is founded is conclusive, and it will not be reviewed by the courts." Judge Sanborn then sums up the rules governing the authority of the judiciary to pass or act upon orders of the Postmaster General, as follows: That a decision of the Postmaster General may be enjoined in a court of equity on the grounds: "(1) That it was issued in a case which was not within the jurisdiction of the Postmaster General * * *; (2) or on the ground that it was issued in the absence of any evidence to sustain it or upon facts found, conceded, or established beyond dispute which do not sustain it, or that its issue was induced by any other error of law; or (3) that through fraud or a gross mistake of fact the Postmaster General fell into a misapprehension of the facts which caused him to issue an order which was palpably wrong."

If we understand the position of the complainants in this case, it is that the injunction should issue because: First, there was no competent evidence presented at the hearing before the Postmaster General which would establish, or upon which the solicitor or the Postmaster General could legally and lawfully find, that they had been engaged in conducting a scheme or device for obtaining money through the mails by means of false and fraudulent · pretenses, representations, and promises in violation of sections 259 and 732 of title 39, U. S. Code (39 USCA §§ 259, 732); second, that the solicitor in the hearing had before him acted arbitrarily in denying to the complainants an opportunity or right to have their alleged expert chemist present during the examination of the expert chemist presented by the government;

and, third, that the action of the solicitor was unwarranted, unlawful, and arbitrary, in that certain evidence proffered by these complainants was refused admittance and consideration upon the hearing and that certain tests, which were offered to be made by the complainants in addition to those offered at the hearing, were denied and refused recognition by the solicitor.

■ The evidence that was refused to be considered by the solicitor, if it was refused, consisted in a great number of testimonials in the form of letters from alleged users of and agents for the product manufactured by the complainants of satisfactory results in its use. These offers of testimonials might be considered by the solicitor as incompetent, because they were hearsay and such conclusion would be a proper reason for a refusal on his part to consider them.

■ The affidavits also present and affirm that at the hearing the complainants offered, on two separate occasions to put on a demonstration of their product, which offer an opportunity was refused by the government's counsel and not accepted by the solicitor, and that the solicitor also refused to consider offers of further tests to be made by Mr. L. D. Benedict, the alleged expert chemist for the complainants. Congress has not defined or prescribed any rules of procedure to be had before the Postmaster General in a hearing under the statutes in question, but it is apparent that a full and fair hearing on demand should be permitted. That does not necessarily mean that the solicitor holding the hearing should require all the methods and procedures of a court hearing and the rules of evidence may by him to some extent be disregarded. The investigation may even be secret and ex parte. If this is not proper procedure, such methods at least are not unauthorized by the law and could not be considered by a court as unwarranted and unlawful unless perhaps a showing of fraud should be alleged and proven. Hall v. Willcox (C. C.) 225 F. 333. However, refusing to consider these proffered future tests, if they were refused by the solicitor, would not in any way or manner challenge the fairness of the hearing. The complainants in this case had ample notice of the hearing and no witness proffered by them was denied a hearing. The denial of the request that the case might be continued to some later date for further and additional evidence to be presented, or a refusal to permit experiments to be had before the solicitor, were entirely within his discretion and cannot be said to

be indicia or badges of fraud or a substantiated charge that the solicitor in what he did at the hearing acted arbitrarily and in an unwarranted manner under the law.

This leaves only for disposition the main challenge in this court to the fraud order, that it was issued without substantial evidence to support the charges against complainants. The memorandum set forth above practically answers this challenge. Complainants are mistaken in their claim that the only evidence introduced as against them was mere opinions of witnesses and that the opinion of the expert for the government should not be considered as substantive evidence. In this contention complainants rely upon the case of American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 S. Ct. 33, 47 L. Ed. 90. The facts here are entirely different from what they are in that case, which arose on a demurrer wherein all the material facts averred in the bill were admitted for the purpose of the hearing. It may be conceded that the court there held that mere matters of opinion on which witnesses might vary in their conclusions would not substantiate a fraud order such as is here under consideration; but the finding of the solicitor in this case is not based on opinions, but upon a scientific investigation, findings, and tests made by the United States Bureau of Standards. Opinions of experts when founded upon known scientific facts are not to be considered the same as opinions of laymen, but are considered by the courts as substantive evidence. United States Smelting Co. v. Parry (C. C. A.) 166 F. 407; Runkle v. United States (C. C. A.) 42 F.(2d) 804. However, the evidence upon which the facts here were found was not alone based upon such scientific opinions, but upon tests made and facts actually disclosed by independent research of experts in an outstanding scientific bureau of the national government.

The present case is very similar to and is controlled by the case of Leach v. Carlile, 258 U. S. 138, 42 S. Ct. 227, 228, 66 L. Ed. 511. A fraud order as against the advertising of a patent medicine was there sought to be enjoined. The court said: "In argument it is contended that the question decided by the Postmaster General was that the substance which the appellant was selling did not produce the results claimed for it, that this, on the record, was a matter of opinion as to which there was conflict of evidence, and that therefore the case is within the scope of American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 S. Ct. 33, 47 L. Ed. 90. Without considering whether such a state of facts would bring the case within the decision cited, it is sufficient to say that the question really decided by the lower courts was, not that the substance which appellant was selling was entirely worthless as a medicine, as to which there was some conflict in the evidence, but that it was so far from being the panacea which he was advertising it through the mails to be, that by so advertising it he was perpetrating a fraud upon the public. This was a question of fact which the statutes cited committed to the decision of the Postmaster General, and the applicable, settled rule of law is that the conclusion of a head of an executive department on such a question, when committed to him by law, will not be reviewed by the courts where it is fairly arrived at and has substantial evidence to support it, so that it cannot justly be said to be palpably wrong and therefore arbitrary."

It follows, and the clerk will enter an order, that an examination of the record herein fully justifies the conclusion that the Postmaster General had abundant ground for the issuance of fraud order No. 2101 of January 12, 1932, against the complainants here, that the application for a temporary injunction be denied, and that the restraining order now in force be annulled. Complainants except.