## MASSES PUB. CO. v. PATTEN.

(District Court, S. D. New York. July 24, 1917.)

1. POST OFFICE ⊂⟹14—POSTMASTERS—REVIEW OF OFFICIAL ACTION BY COURTS.

A federal court has jurisdiction to review the official action or proposed action of a postmaster, and, if it appears that it is outside of the authority conferred upon him by law, must so decide; but his decision is final if there is any dispute of fact upon which it may rest, and even where it must turn upon a question of law it has a strong presumption of validity.

2. POST OFFICE ⊂⟹14—NONMAILABLE MATTER—SEDITIOUS PUBLICATIONS.

The provisions of Espionage Act June 15, 1917, tit. 1, § 3, making it an offense to "willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or promote the success of its enemies" in time of war includes in the prohibition only statements of fact which the utterer knows to be false, and mere criticism or expression of opinions relating to acts of the government, expressed either in language or by cartoons, however immoderate in tone or harmful in effect, is not within the purview of the statute, and publications containing such matter cannot lawfully be excluded from the mails under title 12, § 1, of the act as in violation of such provision.

3. POST OFFICE ⊂⟹14—NONMAILABLE MATTER—SEDITIOUS PUBLICATIONS.

Such matter is not nonmailable as in violation of the second or third clauses of said section either as "willfully causing or attempting to cause insubordination. disloyalty, mutiny or refusal of duty in the military or naval forces of the United States" or "willfully obstructing the recruiting or enlistment service of the United States to the injury of the service," where it is limited to criticism or abuse of existing law or war policies, even including the conscription law, and stops short of counseling or advising resistance to the law.

In Equity. Suit by the Masses Publishing Company against T. G. Patten, Postmaster of the City of New York. On motion for preliminary injunction. Motion granted.

See, also, 245 Fed. 102, 157 C. C. A. 398; 246 Fed. 24, 158 C. C. A. 250.

⊂⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The plaintiff applies for a preliminary injunction against the postmaster of New York to forbid his refusal to accept its magazine in the mails under the following circumstances: The plaintiff is a publishing company in the city of New York engaged in the production of a monthly revolutionary journal called "The Masses," containing both text and cartoons, each issue of which is ready for the mails during the first ten days of the preceding month. In July, 1917, the postmaster of New York, acting upon the direction of the Postmaster General, advised the plaintiff that the August number to which he had had access would be denied the mails under the Espionage Act of June 15, 1917. Though professing willingness to excerpt from the number any particular matter which was objectionable in the opinion of the Postmaster General, the plaintiff was unable to learn any specification of objection, and thereupon filed this bill, and now applies for a preliminary injunction upon a statement of the facts.

Upon return of the rule to show cause the defendant, while objecting generally that the whole purport of the number was in violation of the law, since it tended to produce a violation of the law, to encourage the enemies of the United States, and to hamper the government in the conduct of the war, specified four cartoons and four pieces of text as especially falling within sections 1 and 2 of title 12 of the act and by the reference of section 1 as within section 3 of title 1. These sections are quoted in the margin.[1]

The four cartoons are entitled respectively, "Liberty Bell," "Conscription," "Making the World Safe for Capitalism," "Congress and Big Business." The first is a picture of the Liberty Bell broken in fragments. The obvious implication, taking the cartoon in its context with the number as a whole, is that the origin, purposes, and conduct of the war have already destroyed the liberties of the country. It is a fair inference that the draft law is an especial instance of the violation of the liberty and fundamental rights of any free people.

The second cartoon shows a cannon to the mouth of which is bound the naked figure of a youth, to the wheel that of a woman, marked "Democracy," and upon the carriage that of a man, marked "Labor." On the ground kneels a draped woman marked "Motherhood" in a posture of desperation, while her infant lies on the ground. The import of this cartoon is obviously that conscription is the destruction of youth, democracy, and labor, and the desolation of the family. No one can dispute that it was intended to rouse detestation for the draft law.

The third cartoon represents a Russian workman symbolizing the Workmen's and Soldiers' Council, seated at a table, studying a paper entitled, "Plan for a Genuine Democracy." At one side Senator Root furtively approaches the figure with a noose marked "Advice," apparently prepared to throw it over the head of the workman, while behind him stands Mr. Charles

---

[1] TITLE I.

Espionage.

Sec. 3. Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies and whoever when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both.

TITLE XII.

Use of Mails.

Section 1. Every letter, writing, circular, postal card, picture, print, engraving, photograph, newspaper, pamphlet, book, or other publication, matter or thing, of any kind, in violation of any of the provisions of this act is hereby declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier: Provided, that nothing in this act shall be so construed as to authorize any person other than an employé of the dead letter office, duly authorized there to, or other person upon a search warrant authorized by law, to open any letter not addressed to himself.

Sec. 2. Every letter, writing, circular, postal card, picture, print, engraving, photograph, newspaper, pamphlet, book, or other publication, matter or thing, of any kind, containing any matter advocating or urging treason, insurrection, or forcible resistance to any law of the United States, is hereby declared to be nonmailable.

E. Russell, the Socialist member of the Russian Commission, in a posture of assent. On the other side a minatory figure of Japan appears through a door carrying a raised sword, marked "Threat," while behind him follows a conventional John Bull, stirring him up to action. The import again is unambiguous and undisputed. The Russian is being ensnared and bullied by the United States and its Allies into a continuance of the war for purposes prejudicial to true democracy.

The fourth and last cartoon presents a collection of pursy magnates standing about a table on which lies a map, entitled "War Plans." At the door enters an apologetic person, hat in hand, diffidently standing at the threshold, while one of the magnates warns him to keep off. The legend at the bottom runs as follows: "Congress: 'Excuse me, gentlemen, where do I come in?' Big Business: "Run along, now! We got through with you when you declared war for us.'" It is not necessary to expatiate upon the import of this cartoon.

The four pieces of text are annexed to the end of this report as addenda, A, B, C, and D. After that part of B so set forth, the article continues, showing the hardships and maltreatment of a number of English conscientious objectors, partly from excerpts out of their letters, partly from reports of what they endured. These statements show much brutality in the treatment of these persons.

The challenged text, omitting the excerpts just mentioned, total about one page out of a total of 28. Throughout the rest are sprinkled other texts designed to arouse animosity to the draft and to the war, and criticisms of the President's consistency in favoring the declaration of war.

The defendant attaches to its papers as well copies of the June and July numbers of The Masses and a number of Mother Earth, a magazine edited by Emma Goldman and Alexander Berkman, recently convicted in this court for a conspiracy to resist the draft. The earlier copies of The Masses contain inflammatory articles upon the war and conscription in revolutionary vein, some of which go to the extent of counseling those subject to conscription to resist. This case does not concern them except in so far as the defendant's position is correct that in the interpretation of the August number the purpose of the writers may be inferred from what preceded, and that an audience addressed in the earlier numbers would put upon the later number a significance beyond what the contents would naturally bear if it stood alone. It is not necessary for a determination of this case to set forth in detail the contents of these numbers. The copy of Mother Earth also need not be referred to.

Gilbert E. Roe, of New York City, for plaintiff.

Earl B. Barnes, of New York City, for defendant.

LEARNED HAND, District Judge (after stating the facts as above). [1] It is well settled that this court has jurisdiction to review the act of the postmaster. School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90; Post Publishing Co. v. Murray, 230 Fed. 773, 145 C. C. A. 83; Bruce v. United States, 202 Fed. 98, 120 C. C. A. 370; United States v. Atlanta Journal, 210 Fed. 275, 127 C. C. A. 123. If it appears that his proposed official course is outside of the authority conferred upon him by law, the court cannot escape the duty of so deciding, just as in the case of any other administrative officer. Noble v. Union River Logging Co., 147 U. S. 165, 13 Sup. Ct. 271, 37 L. Ed. 123; Gegiow v. Uhl, 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114. However, again, as in the case of other such officers, the postmaster's decision is final if there be any dispute of fact upon which his decision may rest, and even where it must turn upon a point of law, it has a strong presumption of validity.

Bates & Guild Co. v. Payne, 194 U. S. 106, 24 Sup. Ct. 595, 48 L. Ed. 894; Public Clearing House v. Coyne, 194 U. S. 497, 24 Sup. Ct. 789, 48 L. Ed. 1092. In this case there is no dispute of fact which the plaintiff can successfully challenge except the meaning of the words and pictures in the magazine. As to these the query must be: What is the extreme latitude of the interpretation which must be placed upon them, and whether that extremity certainly falls outside any of the provisions of the act of June 15, 1917. ·Unless this be true, the decision of the postmaster must stand. It will be necessary, first, to interpret the law, and, next, the words and pictures.

It must be remembered at the outset, and the distinction is of critical consequence throughout, that no question arises touching the war powers of Congress. It may be that Congress may forbid the mails to any matter which tends to discourage the successful prosecution of the war. It may be that the fundamental personal rights of the individual must stand in abeyance, even including the right of the freedom of the press, though that is not here in question. Ex parte Jackson, 96 U S. 727, 24 L. Ed. 877; Re Rapier, 143 U. S. 110, 12 Sup. Ct. 374, 36 L. Ed. 93. It may be that the peril of war, which goes to the very existence of the state, justifies any measure of compulsion, any measure of suppression, which Congress deems necessary to its safety, the liberties of each being in subjection to the liberties of all. The Legal Tender Cases, 12 Wall, 457. It may be that under the war power Congress may mobilize every resource of men and materials, without impediment or limitation, since the power includes all means which are the practice of nations in war. It would indeed not be necessary, perhaps in ordinary cases it would not be appropriate, even to allude to such putative incidents of the war power, but it is of great consequence at the present time with accuracy to define the exact scope of the question at bar, that no implication may arise as to any limitation upon the absolute and uncontrolled nature of that power. Here is presented solely the question of how far Congress after much discussion has up to the present time seen fit to exercise a power which may extend to measures not yet even considered, but necessary to the existence of the state as such. Every one agrees that the exercise of such power, however wide it may be, rests in Congress alone, at least subject to such martial law as may rest with the President within the sphere of military operations, however broadly that may be defined. The defendant's authority is based upon the act of Congress, and the intention of that act is the single measure of that authority. If Congress has omitted repressive measures necessary to the safety of the nation and success of its great enterprise, the responsibility rests upon Congress and with it the power to remedy that omission.

[2] Coming to the act itself, it is conceded that the defendant's only direct authority arises from title 12 of the act, §§ 1 and 2. His position is that under section 1 any writing which by its utterance would infringe any of the provisions of other titles in the act becomes nonmailable. I may accept that assumption for the sake of argument and turn directly to section 3 of title 1, which the plaintiff is said to violate. That section contains three provisions. The first is, in sub-

stance, that no one shall make any false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies. The defendant says that the cartoons and text of the magazine, constituting, as they certainly do, a virulent attack upon the war and those laws which have been enacted to assist its prosecution, may interfere with the success of the military forces of the United States. That such utterances may have the effect so ascribed to them is unhappily true; publications of this kind enervate public feeling at home which is their chief purpose, and encourage the success of the enemies of the United States abroad, to which they are generally indifferent. Dissension within a country is a high source of comfort and assistance to its enemies; the least intimation of it they seize upon with jubilation. There cannot be the slightest question of the mischievous effects of such agitation upon the success of the national project, or of the correctness of the defendant's position.

All this, however, is beside the question whether such an attack is a willfully false statement. That phrase properly includes only a statement of fact which the utterer knows to be false, and it cannot be maintained that any of these statements are of fact, or that the plaintiff believes them to be false. They are all within the range of opinion and of criticism; they are all certainly believed to be true by the utterer. As such they fall within the scope of that right to criticise either by temperate reasoning, or by immoderate and indecent invective, which is normally the privilege of the individual in countries dependent upon the free expression of opinion as the ultimate source of authority. The argument may be trivial in substance, and violent and perverse in manner, but so long as it is confined to abuse of existing policies or laws, it is impossible to class it as a false statement of facts of the kind here in question. To modify this provision, so clearly intended to prevent the spreading of false rumors which may embarrass the military, into the prohibition of any kind of propaganda, honest or vicious, is to disregard the meaning of the language, established by legal construction and common use, and to raise it into a means of suppressing intemperate and inflammatory public discussion, which was surely not its purpose.

[3] The next phrase relied upon is that which forbids any one from willfully causing insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces of the United States. The defendant's position is that to arouse discontent and disaffection among the people with the prosecution of the war and with the draft tends to promote a mutinous and insubordinate temper among the troops. This, too, is true; men who become satisfied that they are engaged in an enterprise dictated by the unconscionable selfishness of the rich, and effectuated by a tyrannous disregard for the will of those who must suffer and die, will be more prone to insubordination than those who have faith in the cause and acquiesce in the means. Yet to interpret the word "cause" so broadly would, as before, involve necessarily as a consequence the suppression of all hostile criticism, and of all opinion except what encouraged and supported the existing policies, or which

fell within the range of temperate argument. It would contradict the normal assumption of democratic government that the suppression of hostile criticism does not turn upon the justice of its substance or the decency and propriety of its temper. Assuming that the power to repress such opinion may rest in Congress in the throes of a struggle for the very existence of the state, its exercise is so contrary to the use and wont of our people that only the clearest expression of such a power justifies the conclusion that it was intended.

The defendant's position, therefore, in so far as it involves the suppression of the free utterance of abuse and criticism of the existing law, or of the policies of the war, is not, in my judgment, supported by the language of the statute. Yet there has always been a recognized limit to such expressions, incident indeed to the existence of any compulsive power of the state itself. One may not counsel or advise others to violate the law as it stands. Words are not only the keys of persuasion, but the triggers of action, and those which have no purport but to counsel the violation of law cannot by any latitude of interpretation be a part of that public opinion which is the final source of government in a democratic state. The defendant asserts not only that the magazine indirectly through its propaganda leads to a disintegration of loyalty and a disobedience of law, but that in addition it counsels and advises resistance to existing law, especially to the draft. The consideration of this aspect of the case more properly arises under the third phrase of section 3, which forbids any willful obstruction of the recruiting or enlistment service of the United States, but, as the defendant urges that the magazine falls within each phrase, it is as well to take it up now. To counsel or advise a man to an act is to urge upon him either that it is his interest or his duty to do it. While, of course, this may be accomplished as well by indirection as expressly, since words carry the meaning that they impart, the definition is exhaustive, I think, and I shall use it. Political agitation, by the passions it arouses or the convictions it engenders, may in fact stimulate men to the violation of law. Detestation of existing policies is easily transformed into forcible resistance of the authority which puts them in execution, and it would be folly to disregard the causal relation between the two. Yet to assimilate agitation, legitimate as such, with direct incitement to violent resistance, is to disregard the tolerance of all methods of political agitation which in normal times is a safeguard of free government. The distinction is not a scholastic subterfuge, but a hard-bought acquisition in the fight for freedom, and the purpose to disregard it must be evident when the power exists. If one stops short of urging upon others that it is their duty or their interest to resist the law, it seems to me one should not be held to have attempted to cause its violation. If that be not the test, I can see no escape from the conclusion that under this section every political agitation which can be shown to be apt to create a seditious temper is illegal. I am confident that by such language Congress had no such revolutionary purpose in view.

It seems to me, however, quite plain that none of the language and none of the cartoons in this paper can be thought directly to counsel

or advise insubordination or mutiny, without a violation of their meaning quite beyond any tolerable understanding. I come, therefore,. to the third phrase of the section, which forbids any one from willfully obstructing the recruiting or enlistment service of the United States. I am not prepared to assent to the plaintiff's position that this only refers to acts other than words, nor that the act thus defined must be shown to have been successful. One may obstruct without preventing, and the mere obstruction is an injury to the service; for it throws impediments in its way. Here again, however, since the question is of the expression of opinion, I construe the sentence, so far as it restrains public utterance, as I have construed the other two, and as therefore limited to the direct advocacy of resistance to the recruiting and enlistment service. If so, the inquiry is narrowed to the question whether any of the challenged matter may be said to advocate resistance to the draft, taking the meaning of the words with the utmost latitude which they can bear.

As to the cartoons it seems to me quite clear that they do not fall within such a test. Certainly the nearest is that entitled "Conscription," and the most that can be said of that is that it may breed such animosity to the draft as will promote resistance and strengthen the determination of those disposed to be recalcitrant. There is no intimation that, however hateful the draft may be, one is in duty bound to resist it, certainly none that such resistance is to one's interest. I cannot, therefore, even with the limitations which surround the power of the court, assent to the assertion that any of the cartoons violate the act.

The text offers more embarrassment. The poem to Emma Goldman and Alexander Berkman, at most, goes no further than to say that they are martyrs in the cause of love among nations. Such a sentiment holds them up to admiration, and hence their conduct to possible emulation. The paragraph in which the editor offers to receive funds for their appeal also expresses admiration for them, but goes no further. The paragraphs upon conscientious objectors are of the same kind. They go no further than to express high admiration for those who have held and are holding out for their convictions even to the extent of resisting the law. It is plain enough that the paper has the fullest sympathy for these people, that it admires their courage, and that it presumptively approves their conduct. Indeed, in the earlier numbers and before the draft went into effect the editor urged resistance. Since I must interpret the language in the most hostile sense, it is fair to suppose, therefore, that these passages go as far as to say:

"These men and women are heroes and worthy of a freeman's admiration. We approve their conduct; we will help to secure them their legal rights. They are working for the betterment of mankind through their obdurate consciences."

Moreover, these passages, it must be remembered, occur in a magazine which attacks with the utmost violence the draft and the war. That such comments have a tendency to arouse emulation in others is clear enough, but that they counsel others to follow these examples

is not so plain. Literally at least they do not, and while, as I have said, the words are to be taken, not literally, but according to their full import, the literal meaning is the starting point for interpretation. One may admire and approve the course of a hero without feeling any duty to follow him. There is not the least implied intimation in these words that others are under a duty to follow. The most that can be said is that, if others do follow, they will get the same admiration and the same approval. Now, there is surely an appreciable distance between esteem and emulation; and unless there is here some advocacy of such emulation, I cannot see how the passages can be said to fall within the law. If they do, it would follow that, while one might express admiration and approval for the Quakers or any established sect which is excused from the draft, one could not legally express the same admiration and approval for others who entertain the same conviction, but do not happen to belong to the society of Friends. It cannot be that the law means to curtail such expressions merely, because the convictions of the class within the draft are stronger than their sense of obedience to the law. There is ample evidence in history that the Quaker is as recalcitrant to legal compulsion as any man; his obstinacy has been regarded in the act, but his disposition is as disobedient as that of any other conscientious objector. Surely, if the draft had not excepted Quakers, it would be too strong a doctrine to say that any who openly admire their fortitude or even approved their conduct was willfully obstructing the draft.

When the question is of a statute constituting a crime, it seems to me that there should be more definite evidence of the act. The question before me is quite the same as what would arise upon a motion to dismiss an indictment at the close of the proof: Could any reasonable man say, not that the indirect result of the language might be to arouse a seditious disposition, for that would not be enough, but that the language directly advocated resistance to the draft? I cannot think that upon such language any verdict would stand. Of course, the language of the statute cannot have one meaning in an indictment and another when the case comes up here, because by hypothesis, if this paper is nonmailable under section 3 of title 1, its editors have committed a crime in uttering it.

After the foregoing discussion it is hardly necessary to speak of section 2 of title 12. The plaintiff insists that refusal to comply with the provisions of the draft cannot be classed as forcible resistance; that such a refusal is, at most, only inaction, the neglect of an affirmative duty even to the extent of submitting to imprisonment. It may be plausibly contended that by forcible resistance Congress meant more than passive resistance, but even if this be not true, the result is the same, because, so construed, the section goes no further than the last phrase of section 3 of title 1 as I have construed it here. What was therefore said upon that section will serve here.

The defendant's action was based, as I understand it, not so much upon the narrow question whether these four passages actually advocated resistance, though that point was distinctly raised, as upon the doctrine that the general tenor and animus of the paper as a whole

were subversive to authority and seditious in effect. I cannot accept this test under the law as it stands at present. The tradition of English-speaking freedom has depended in no small part upon the merely procedural requirement that the state point with exactness to just that conduct which violates the law. It is difficult and often impossible to meet the charge that one's general ethos is treasonable; such a latitude for construction implies a personal latitude in administration which contradicts the normal assumption that law shall be embodied in general propositions capable of some measure of definition. The whole crux of this case turns indeed upon this thesis. I make no question of the power of Congress to establish a personal censorship of the press under the war power; that question, as I have already said, does not arise. I am quite satisfied that it has not as yet chosen to create one, and with the greatest deference it does not seem to me that anything here challenged can be illegal upon any other assumption.

Finally, the question arises as to how far the earlier numbers of the paper should be considered. The theory is that the August number covertly refers to the explicit counsel of resistance in the numbers of June and July. A priori such a reference might legitimately incorporate the earlier expressions; I do not doubt that the memory of those expressions may in fact remain in the minds of readers and that they may be revived by the sympathy and accord with conscientious objectors expressed in the August number. Yet the plaintiff is still entitled to ask, whatever the results of its past utterance may be, that some words be pointed out which by some reference fairly inferable from the words themselves relate back to earlier and more explicit statements. I think there are no words in the four passages which admit of such an interpretation.

It follows that the plaintiff is entitled to the usual preliminary injunction.

A.

## A Question.

Often I wish we had a continuing census bureau to which we might apply, and have a census taken with classifications of our own choosing. I would like to know to-day, how many men and women there are in America who admire the self-reliance and sacrifice of those who are resisting the conscription law on the ground that they believe it violates the sacred rights and liberties of man. How many of the American population are in accord with the American press when it speaks of the arrest of these men of genuine courage as a "round-up of slackers"? Are there none to whom this picture of the American republic adopting towards its citizens the attitude of a rider toward cattle is appalling? I recall the Essays of Emerson, the Poems of Walt Whitman, which sounded a call never heard before in the world's literature, for erect and insuppressible individuality, the courage of solitary faith and heroic assertion of self. It was America's contribution to the ideals of man. It painted the quality of her culture for those in the old world who loved her. It was a revolt of the aspiring mind against that instinctive running with custom and the support of numbers, which is an hereditary frailty of our nerves. It was a determination to worship and to love, in the living and laughing present, the same heroisms that we love when we look back so seriously over the past.

I wonder if the number is few to whom this high resolve was the distinction of our American idealism, and who feel inclined to bow their heads to those who are going to jail under the whip of the state, because they will not do

what they do not believe in doing. Perhaps there are enough of us, if we make ourselves heard in voice and letter, to modify this ritual of contempt in the daily press, and induce the American government to undertake the imprisonment of heroic young men with a certain sorrowful dignity that will be new in the world.

B.

### A Tribute.

Emma Goldman and Alexander Berkman
Are in prison,
Although the night is tremblingly beautiful
And the sound of water climbs down the rocks
And the breath of the night air moves through multitudes and multitudes of
    leaves
That love to waste themselves for the sake of the summer.
Emma Goldman and Alexander Berkman
Are in prison tonight,
But they have made themselves elemental forces,
Like the water that climbs down the rocks;
Like the wind in the leaves;
Like the gentle night that holds us;
They are working on our destinies;
They are forging the love of the nations;
. . . . . . . . . . . . . . . . . . . . . . .
Tonight they lie in prison.

C.

### Conscientious Objectors.

We publish below a number of letters written last year from English prisons by conscientious objectors. It is as yet uncertain what treatment the United States government will mete out to its thousands of conscientious objectors, but we believe that our protestors against government tyranny will be as steadfast as their English comrades. It is not by any means as certain that they will be as polite to their guards and tormentors, but we hope they will remember that these are acting under official compulsion and not as free men.

Some discussion has arisen as to whether those whose objection to participating in war is not embodied in a religious formula have the right to call their objection a "conscientious" one. We believe that this old-fashioned term is, however, one that fits their case. There are some laws which the individual feels that he cannot obey, and which he will suffer any punishment, even that of death, rather than recognize as having authority over him. This fundamental stubbornness of the free soul, against which all the powers of the state are helpless, constitutes a conscientious objection, whatever its original sources may be in political or social opinion. It remains to be demonstrated that a political disapproval of this war can express itself in the same heroic firmness that has in England upheld the Christian objectors to war as murder. We recommend to all who intend to stick it out to the end, a thorough reading of the cases which follow, so that they may be prepared for what is at least rather likely to happen to them.

D.

### Friends of American Freedom.

Alexander Berkman and Emma Goldman have been arrested, charged with advocating in their paper, Mother Earth, that those liable to the military draft, who do not believe in the war, should refuse to register. That they would be arrested, on some charge, and subjected to bitter prosecution, has been inevitable ever since they appeared as the spokesmen of a working class protest against the plans of American militarism. Whatever you may think of the practicability of such a protest, you must, with their friends, pay tribute of admiration for their courage and devotion.

Alexander Berkman is one of the few men whose character and intelli-

gence ever stood firm through a quarter of a lifetime in prison. Emma Goldman has followed her extreme ideal of liberty for 30 years, up and down, in better places and worse than the federal penitentiary. They can both endure what befalls them. They have more resources in their souls, perhaps, as they have the support of a more absolute faith, than we have who admire them. But let us give them every chance for acquittal that the constitution of the times allow. Let us give them every chance to state their faith. The Masses will receive funds for this purpose.