Justice Stevens,
with whom Justice Souter and Justice Ginsburg join, dissenting.
A significant fact barely mentioned by the Court sheds a revelatory light on the motives of both the students and the principal of Juneau-Douglas High School (JDHS). On Janu *434 ary 24, 2002, the Olympic Torch Relay gave those Alaska residents a rare chance to appear on national television. As Joseph Frederick repeatedly explained, he did not address the curious message — “BONG HiTS 4 JESUS” — to his fellow students. He just wanted to get the camera crews’ attention. Moreover, concern about a nationwide evaluation of the conduct of the JDHS student body would have justified the principal’s decision to remove an attention-grabbing 14-foot banner, even if it had merely proclaimed “Glaciers Melt!”
I agree with the Court that the principal should not be held liable for pulling down Frederick’s banner. See Harlow v. Fitzgerald, 457 U. S. 800, 818 (1982). I would hold, however, that the school’s interest in protecting its students from exposure to speech “reasonably regarded as promoting illegal drug use,” ante, at 396, cannot justify disciplining Frederick for his attempt to make an ambiguous statement to a television audience simply because it contained an oblique reference to drugs. The First Amendment demands more, indeed, much more.
The Court holds otherwise only after laboring to establish two uncontroversial propositions: first, that the constitutional rights of students in school settings are not coextensive with the rights of adults, see ante, at 403-406; and second, that deterring drug use by schoolchildren is a valid and terribly important interest, see ante, at 407-408. As to the first, I take the Court’s point that the message on Frederick’s banner is not necessarily protected speech, even though it unquestionably would have been had the banner been unfurled elsewhere. As to the second, I am willing to assume that the Court is correct that the pressing need to deter drug use supports JDHS’ rule prohibiting willful conduct that expressly “advocates the use of substances that are illegal to minors.” App. to Pet. for Cert. 53a. But it is a gross non sequitur to draw from these two unremarkable propositions the remarkable conclusion that the school may suppress stu *435 dent speech that was never meant to persuade anyone to do anything.
In my judgment, the First Amendment protects student speech if the message itself neither violates a permissible rule nor expressly advocates conduct that is illegal and harmful to students. This nonsense banner does neither, and the Court does serious violence to the First Amendment in upholding — indeed, lauding — a school’s decision to punish Frederick for expressing a view with which it disagreed.
I
In December 1965, we were engaged in a controversial war, a war that “divided this country as few other issues ever have.” Tinker v. Des Moines Independent Community School Dist., 393 U. S. 503, 524 (1969) (Black, J., dissenting). Having learned that some students planned to wear black armbands as a symbol of opposition to the country’s involvement in Vietnam, officials of the Des Moines public school district adopted a policy calling for the suspension of any student who refused to remove the armband. As we explained when we considered the propriety of that policy, “[t]he school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners.” Id., at 508. The district justified its censorship on the ground that it feared that the expression of a controversial and unpopular opinion would generate disturbances. Because the school officials had insufficient reason to believe that those disturbances would “materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,” we found the justification for the rule to lack any foundation and therefore held that the censorship violated the First Amendment. Id., at 509 (internal quotation marks omitted).
Justice Harlan dissented, but not because he thought the school district could censor a message with which it dis *436 agreed. Rather, he would have upheld the district’s rule only because the students never cast doubt on the district’s antidisruption justification by proving that the rule was motivated “by other than legitimate school concerns — for example, a desire to prohibit the expression of an unpopular point of view, while permitting expression of the dominant opinion.” Id., at 526.
Two cardinal First Amendment principles animate both the Court’s opinion in Tinker and Justice Harlan’s dissent. First, censorship based on the content of speech, particularly censorship that depends on the viewpoint of the speaker, is subject to the most rigorous burden of justification:
“Discrimination against speech because of its message is presumed to be unconstitutional. ... When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.” Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819, 828-829 (1995) (citation omitted).
Second, punishing someone for advocating illegal conduct is constitutional only when the advocacy is likely to provoke the harm that the government seeks to avoid. See Brandenburg v. Ohio, 395 U. S. 444, 449 (1969) (per curiam) (distinguishing “mere advocacy” of illegal conduct from “incitement to imminent lawless action”).
However necessary it may be to modify those principles in the school setting, Tinker affirmed their continuing vitality. 393 U. S., at 509 (“In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was *437 caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained” (internal quotation marks omitted)). As other federal courts have long recognized, under Tinker,
“regulation of student speech is generally permissible only when the speech would substantially disrupt or interfere with the work of the school or the rights of other students. . . . Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance.” Saxe v. State College Area School Dist., 240 F. 3d 200, 211 (CA3 2001) (Alito, J.) (emphasis added).
Yet today the Court fashions a test that trivializes the two cardinal principles upon which Tinker rests. See ante, at 408 (“[S]chools [may] restrict student expression that they reasonably regard as promoting illegal drug use”). The Court’s test invites stark viewpoint discrimination. In this case, for example, the principal has unabashedly acknowledged that she disciplined Frederick because she disagreed with the pro-drug viewpoint she ascribed to the message on the banner, see App. 25 — a viewpoint, incidentally, that Frederick has disavowed, see id., at 28. Unlike our recent decision in Tennessee Secondary School Athletic Assn. v. Brentwood Academy, ante, at 296 (plurality opinion), see also ante, at 423 (Alito, J., concurring), the Court’s holding in this case strikes at “the heart of the First Amendment” because it upholds a punishment meted out on the basis of a listener’s disagreement with her understanding (or, more likely, misunderstanding) of the speaker’s viewpoint. “If there is a bedrock principle underlying the First Amend *438 ment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.” Texas v. Johnson, 491 U. S. 397, 414 (1989).
It is also perfectly clear that “promoting illegal drug use,” ante, at 409, comes nowhere close to proseribable “incitement to imminent lawless action.” Brandenburg, 395 U. S., at 449. Encouraging drug use might well increase the likelihood that a listener will try an illegal drug, but that hardly justifies censorship:
“Every denunciation of existing law tends in some measure to increase the probability that there will be violation of it. Condonation of a breach enhances the probability. Expressions of approval add to the probability. . . . Advocacy of law-breaking heightens it still further. But even advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on.” Whitney v. California, 274 U. S. 357, 376 (1927) (Brandeis, J., concurring) (footnote omitted).
No one seriously maintains that drug advocacy -(much less Frederick’s ridiculous sign) comes within the vanishingly small category of speech that can be prohibited because of its feared consequences. Such advocacy, to borrow from Justice Holmes, “ha[s] no chance of starting a present conflagration.” Gitlow v. New York, 268 U. S. 652, 673 (1925) (dissenting opinion).
II
The Court rejects outright these twin foundations of Tinker because, in its view, the unusual importance of protecting children from the scourge of drugs supports a ban on all speech in the school environment that promotes drug use. Whether or not such a rule is sensible as a matter of policy, carving out pro-drug speech for uniquely harsh treatment *439 finds no support in our case law and is inimical to the values protected by the First Amendment.[1] See infra, at 446-448.
I will nevertheless assume for the sake of argument that the school’s concededly powerful interest in protecting its students adequately supports its restriction on “any assembly or public expression that . . . advocates the use of substances that are illegal to minors . . . .” App. to Pet. for Cert. 53a. Given that the relationship between schools and students “is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults,” Vernonia School Dist. 47J v. Acton, 515 U. S. 646, 655 (1995), it might well be appropriate to tolerate some targeted viewpoint discrimination in this unique setting. And while conventional speech may be restricted only when likely to “incit[e] . . . imminent lawless action,” Brandenburg, 395 U. S., at 449, it is possible that our rigid imminence requirement ought to be relaxed at schools. See Bethel School Dist. No. 403 v. Fraser, 478 U. S. 675, 682 (1986) (“[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings”).
But it is one thing to restrict speech that advocates drug use. It is another thing entirely to prohibit an obscure message with a drug theme that a third party subjectively— and not very reasonably — thinks is tantamount to express advocacy. Cf. Masses Pub. Co. v. Patten, 244 F. 535, 540, 541 (SDNY 1917) (Hand, J.) (distinguishing sharply between “agitation, legitimate as such,” and “the direct advocacy” of unlawful conduct). Even the school recognizes the paramount need to hold the line between, on the one hand, non-disruptive speech that merely expresses a viewpoint that is unpopular or contrary to the school’s preferred message, and on the other hand, advocacy of an illegal or unsafe course of *440 conduct. The district’s prohibition of drug advocacy is a gloss on a more general rule that is otherwise quite tolerant of nondisruptive student speech:
“Students will not be disturbed in the exercise of their constitutionally guaranteed rights to assemble peaceably and to express ideas and opinions, privately or publicly, provided that their activities do not infringe on the rights of others and do not interfere with the operation of the educational program.
“The Board will not permit the conduct on school premises of any willful activity ... that interferes with the orderly operation of the educational program or offends the rights of others. The Board specifically prohibits any assembly or public expression that . . . advocates the use of substances that are illegal to minors . ...” App. to Pet. for Cert. 53a; see also ante, at 398 (opinion of the Court) (quoting rule in part).
There is absolutely no evidence that Frederick’s banner’s reference to drug paraphernalia “willful[ly]” infringed on anyone’s rights or interfered with any of the school’s educational programs.[2] On its face, then, the rule gave Frederick wide berth “to express [his] ideas and opinions” so long as they did not amount to “advoca[cy]” of drug use. App. to Pet. for Cert. 53a. If the school’s rule is, by hypothesis, a valid one, it is valid only insofar as it scrupulously preserves adequate space for constitutionally protected speech. When First Amendment rights are at stake, a rule that “sweep[s] in a great variety of conduct under a general and indefinite characterization” may not leave “too wide a discretion in its *441 application.” Cantwell v. Connecticut, 310 U. S. 296, 308 (1940). Therefore, just as we insisted in Tinker that the school establish some likely connection between the armbands and their feared consequences, so too JDHS must show that Frederick’s supposed advocacy stands a meaningful chance of making otherwise-abstemious students try marijuana.
But instead of demanding that the school make such a showing, the Court punts. Figuring out just how it punts is tricky; “[t]he mode of analysis [it] employ[s] ... is not entirely clear,” see ante, at 404. On occasion, the Court suggests it is deferring to the principal’s “reasonable” judgment that Frederick’s sign qualified as drug advocacy.[3] At other times, the Court seems to say that it thinks the banner’s message constitutes express advocacy.[4] **4 Either way, its approach is indefensible.
To the extent the Court defers to the principal’s ostensibly reasonable judgment, it abdicates its constitutional responsibility. The beliefs of third parties, reasonable or otherwise, have never dictated which messages amount to proscribable advocacy. Indeed, it would be a strange constitutional doctrine that would allow the prohibition of only the narrowest category of speech advocating unlawful conduct, see Bran *442 denburg, 395 U. S., at 447-448, yet would permit a listener’s perceptions to determine which speech deserved constitutional protection.[5]
Such a peculiar doctrine is alien to our case law. In Abrams v. United States, 250 U. S. 616 (1919), this Court affirmed the conviction of a group of Russian “rebels, revolutionists, [and] anarchists,” id., at 617-618 (internal quotation marks omitted), on the ground that the leaflets they distributed were thought to “incite, provoke and encourage resistance to the United States,” id., at 617 (internal quotation marks omitted). Yet Justice Holmes’ dissent — which has emphatically carried the day — never inquired into the reasonableness of the United States’ judgment that the leaflets would likely undermine the war effort. The dissent instead ridiculed that judgment: “[N]obody can suppose that the surreptitious publishing of a silly leaflet by an unknown man, without more, would present any immediate danger that its opinions would hinder the success of the government arms or have any appreciable tendency to do so.” Id., at 628. In Thomas v. Collins, 323 U. S. 516 (1945) (opinion for the Court by Rutledge, J.), we overturned the conviction of a union organizer who violated a restraining order prohibiting him from exhorting workers. In so doing, we held that the distinction between advocacy and incitement could not depend on how one of those workers might have understood the organizer’s speech. That would “pu[t] the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may *443 be drawn as to his intent and meaning.” Id., at 535. In Cox v. Louisiana, 379 U. S. 536, 543 (1965), we vacated a civil rights leader’s conviction for disturbing the peace, even though a Baton Rouge sheriff had “deem[ed]” the leader’s “appeal to . . . students to sit in at the lunch counters to be ‘inflammatory.’ ” We never asked if the sheriff’s in-person, on-the-spot judgment was “reasonable.” Even in Fraser, we made no inquiry into whether the school administrators reasonably thought the student’s speech was obscene or profane; we rather satisfied ourselves that “[t]he pervasive sexual innuendo in Fraser’s speech was plainly offensive to both teachers and students — indeed to any mature person.” 478 U. S., at 683. Cf. Bose Corp. v. Consumers Union of United States, Inc., 466 U. S. 485, 499 (1984) (“[I]n cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression” (internal quotation marks omitted)).[6]
*444 To the extent the Court independently finds that “BONG HiTS 4 JESUS” objectively amounts to the advocacy of illegal drug use — in other words, that it can most reasonably be interpreted as such — that conclusion practically refutes itself. This is a nonsense message, not advocacy. The Court’s feeble effort to divine its hidden meaning is strong evidence of that. Ante, at 402 (positing that the banner might mean, alternatively, “ ‘[Take] bong hits,’ ” “ ‘bong hits [are a good thing], ’ ” or “ ‘[we take] bong hits’ ”). Frederick’s credible and uncontradicted explanation for the message— he just wanted to get on television — is also relevant because a speaker who does not intend to persuade his audience can hardly be said to be advocating anything.[7] **7 But most importantly, it takes real imagination to read a “cryptic” message (the Court’s characterization, not mine, see ante, at 401) with a slanting drug reference as an incitement to drug use. Admittedly, some high school students (including those who use drugs) are dumb. Most students, however, do not shed their brains at the schoolhouse gate, and most students know dumb advocacy when they see it. The notion that the message on this banner would actually persuade either the average student or even the dumbest one to change his or her behavior is most implausible. That the Court believes such a silly message can be proscribed as advocacy underscores the novelty of its position, and suggests that the principle it articulates has no stopping point.
Even if advocacy could somehow be wedged into Frederick’s obtuse reference to marijuana, that advocacy was at best subtle and ambiguous. There is abundant precedent, including another opinion The Chief Justice announces *445 today, for the proposition that when the “First Amendment is implicated, the tie goes to the speaker,” Federal Election Comm'n v. Wisconsin Right to Life, Inc., post, at 474 (principal opinion), and that “when it comes to defining what speech qualifies as the functional equivalent of express advocacy ... we give the benefit of the doubt to speech, not censorship,” post, at 482. If this were a close case, the tie would have to go to Frederick’s speech, not to the principal’s strained reading of his quixotic message.
Among other things, the Court’s ham-handed, categorical approach is deaf to the constitutional imperative to permit unfettered debate, even among high school students, about the wisdom of the war on drugs or of legalizing marijuana for medicinal use.[8] See Tinker, 393 U. S., at 511 (“[Students] may not be confined to the expression of those sentiments that are officially approved”). If Frederick’s stupid reference to marijuana can in the Court’s view justify censorship, then high school students everywhere could be forgiven for zipping their mouths about drugs at school lest some “reasonable” observer censor and then punish them for promot *446 ing drugs. See also ante, at 426 (Breyer, J., concurring in judgment in part and dissenting in part).
Consider, too, that the school district’s rule draws no distinction between alcohol and marijuana, but applies evenhandedly to all “substances that are illegal to minors.” App. to Pet. for Cert. 53a; see also App. 83 (expressly defining “‘drugs’” to include “all alcoholic beverages”). Given the tragic consequences of teenage alcohol consumption — drinking causes far more fatal accidents than the misuse of marijuana — the school district’s interest in deterring teenage alcohol use is at least comparable to its interest in preventing marijuana use. Under the Court’s reasoning, must the First Amendment give way whenever a school seeks to punish a student for any speech mentioning beer, or indeed anything else that might be deemed risky to teenagers? While I find it hard to believe the Court would support punishing Frederick for flying a “WINE SiPS 4 JESUS” banner — which could quite reasonably be construed either as a protected religious message or as a pro-alcohol message — the breathtaking sweep of its opinion suggests it would.
Ill
Although this case began with a silly, nonsensical banner, it ends with the Court inventing out of whole cloth a special First Amendment rule permitting the censorship of any student speech that mentions drugs, at least so long as someone could perceive that speech to contain a latent pro-drug message. Our First Amendment jurisprudence has identified some categories of expression that are less deserving of protection than others — fighting words, obscenity, and commercial speech, to name a few. Rather than reviewing our opinions discussing sueh categories, I mention two personal recollections that have no doubt influenced my conclusion that it would be profoundly unwise to create special rules for speech about drug and alcohol use.
*447 The Vietnam War is remembered today as an impopular war. During its early stages, however, “the dominant opinion” that Justice Harlan mentioned in his Tinker dissent regarded opposition to the war as unpatriotic, if not treason. 393 U. S., at 526. That dominant opinion strongly supported the prosecution of several of those who demonstrated in Grant Park during the 1968 Democratic Convention in Chicago, see United States v. Dellinger, 472 P. 2d 340 (CA7 1972), and the vilification of vocal opponents of the war like Julian Bond, cf. Bond v. Floyd, 385 U. S. 116 (1966). In 1965, when the Des Moines students wore their armbands, the school district’s fear that they might “start an argument or cause a disturbance” was well founded. Tinker, 393 U. S., at 508. Given that context, there is special force to the Court’s insistence that “our Constitution says we must take th[at] risk; and our history says that it is this sort of hazardous freedom — this kind of openness — that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.” Id., at 508-509 (citation omitted). As we now know, the then-dominant opinion about the Vietnam War was not etched in stone.
Reaching back still further, the current dominant opinion supporting the war on drugs in general, and our antimarijuana laws in particular, is reminiscent of the opinion that supported the nationwide ban on alcohol consumption when I was a student. While alcoholic beverages are now regarded as ordinary articles of commerce, their use was then condemned with the same moral fervor that now supports the war on drugs. The ensuing change in public opinion occurred much more slowly than the relatively rapid shift in Americans’ views on the Vietnam War, and progressed on a state-by-state basis over a period of many years. But just as prohibition in the 1920’s and early 1930’s was secretly questioned by thousands of otherwise law-abiding patrons of *448 bootleggers and speakeasies, today the actions of literally millions of otherwise law-abiding users of marijuana,[9] and of the majority of voters in each of the several States that tolerate medicinal uses of the product,[10] lead me to wonder whether the fear of disapproval by those in the majority is silencing opponents of the war on drugs. Surely our national experience with alcohol should make us wary of dampening speech suggesting — however inarticulately — that it would be better to tax and regulate marijuana than to persevere in a futile effort to ban its use entirely.
Even in high school, a rule that permits only one point of view to be expressed is less likely to produce correct answers than the open discussion of countervailing views. Whitney, 274 U. S., at 377 (Brandeis, J., concurring); Abrams, 250 U. S., at 630 (Holmes, J., dissenting); Tinker, 393 U. S., at 512. In the national debate about a serious issue, it is the expression of the minority’s viewpoint that most demands the protection of the First Amendment. Whatever the better policy may be, a full and frank discussion of the costs and benefits of the attempt to prohibit the use of marijuana is far wiser than suppression of speech because it is unpopular.
I respectfully dissent.

 I also seriously question whether such a ban could really be enforced. Consider the difficulty of monitoring student conversations between classes or in the cafeteria.

 It is also relevant that the display did not take place “on school premises,” as the rule contemplates. App. to Pet. for Cert. 53a. While a separate district rule does make the policy applicable to “social.events and class trips,” id., at 58a, Frederick might well have thought that the Olympic Torch Relay was neither a “social event” (for example, prom) nor a “class trip.”

 See ante, at 396 (stating that the principal “reasonably regarded” Frederick’s banner as “promoting illegal drug use”); ante, at 401 (explaining that “Principal Morse thought the banner would be interpreted by those viewing it as promoting illegal drug use, and that interpretation is plainly a reasonable one”); ante, at 403 (asking whether “a principal may . . . restrict student speech . . . when that speech is reasonably viewed as promoting illegal drug use”); ante, at 408 (holding that “schools [may] restrict student expression that they reasonably regard as promoting illegal drug use”); see also ante, at 422 (Auto, J., concurring) (“[A] public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use”).

 See ante, at 402 (“We agree with Morse. At least two interpretations of the words on the banner demonstrate that the sign advocated the use of illegal drugs”); ante, at 409 (observing that “[w]e have explained our view” that “Frederick’s banner constitutes promotion of illegal drug use”).

 The reasonableness of the view that Frederick’s message was unprotected speech is relevant to ascertaining whether qualified immunity should shield the principal from liability, not to whether her actions violated Frederick’s constitutional rights. Cf. Saucier v. Katz, 533 U. S. 194, 202 (2001) (“The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted”).

 This same reasoning applies when the interpreter is not just a listener, but a legislature. We have repeatedly held that “[d]eferenee to a legislative finding” that certain types of speech are inherently harmful “cannot limit judicial inquiry when First Amendment rights are at stake,” reasoning that “the judicial function commands analysis of whether the specific conduct charged falls within the reach of the statute and if so whether the legislation is consonant with the Constitution.” Landmark Communications, Inc. v. Virginia, 435 U. S. 829, 843, 844 (1978); see also Whitney v. California, 274 U. S. 357, 378-379 (1927) (Brandéis, J., concurring) (“[A legislative declaration] does not preclude enquiry into the question whether, at the time and under the circumstances, the conditions existed which are essential to validity under the Federal Constitution.... Whenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger; whether the danger, if any. was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature”). When legislatures are entitled to no deference as to *444 whether particular speech amounts to a “clear and present danger,” id., at 379, it is hard to understand why the Court would so blithely defer to the judgment of a single school principal.

 In affirming Frederick’s suspension, the district superintendent acknowledged that Frederick displayed his message “for the benefit of television cameras covering the Torch Relay.” App. to Pet. for Cert. 62a.

 The Court’s opinion ignores the fact that the legalization of marijuana is an issue of considerable public concern in Alaska. The State Supreme Court held in 1975 that Alaska’s Constitution protects the right of adults to possess less than four ounces of marijuana for personal use. Ravin v. State, 537 P. 2d 494. In 1990, the voters of Alaska attempted to undo that decision by voting for a ballot initiative recriminalizmg marijuana possession. Initiative Proposal No. 2, §§1-2 (effective Mar. 3, 1991), 11 Alaska Stat., p. 872 (2006). At the time Frederick unfurled his banner, the constitutionality of that referendum had yet to be tested. It was subsequently struck down as unconstitutional. See Noy v. State, 83 P. 3d 538 (App. 2008). In the meantime, Alaska voters had approved a ballot measure decriminalizing the use of marijuana for medicinal purposes, 1998 Ballot Measure No. 8 (approved Nov. 3, 1998), 11 Alaska Stat., p. 883 (codified at Alaska Stat. §§ 11.71.190, 17.37.010-17.37.080), and had rejected a much broader measure that would have decriminalized marijuana possession and granted amnesty to anyone convicted of marijuana-related crimes, see 2000 Ballot Measure No. 5 (failed Nov. 7,2000), 11 Alaska Stat., p. 886.

 See Gonzales v. Raich, 545 U. S. 1, 21, n. 31 (2005) (citing a Government estimate “that in 2000 American users spent $10.5 billion on the purchase of marijuana”).

 Id., at 5 (noting that “at least nine States . . . authorize the use of marijuana for medicinal purposes”).