**JARVIS, Postmaster, v. SHACKELTON INHALER CO.**

No. 9276.

Circuit Court of Appeals, Sixth Circuit.

June 1, 1943.

Harry Rodwin, of Washington, D. C. (Francis M. Shea, Asst. Atty. Gen., Joseph F. Deeb, of Grand Rapids, Mich., and Sidney J. Kaplan and Martin Norr, both of Washington, D. C., on the brief), for appellant.

Dean S. Face, of Grand Rapids, Mich., for appellee.

Before HICKS, ALLEN and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

The Acting Postmaster General, charging that appellee, Shackelton Inhaler Company, was conducting a scheme for obtaining money through the mails by means of false and fraudulent pretenses, representations and promises, in violation of Sections 259 and 732 of 39 U.S.C.A. issued an order to the Postmaster at Grand Rapids, Mich., where the Company carried on business, forbidding him to pay any money orders drawn to the Company's order, and instructing him to return to the senders any mail directed to the Company with the notation "Fraudulent" thereon.

Appellee Company, alleging that the order was issued without evidence to sustain it and that its issuance was arbitrary, unreasonable and oppressive, filed its complaint in the District Court at Grand Rapids against appellant, the Postmaster there, and prayed that he and his agents be enjoined from obeying the order. The court sustained the bill and granted the injunction,—hence this appeal.

Three issues are raised here,—(1) whether the court erred in admitting evidence in addition to that appearing in the administrative record before the Postmaster General; (2) whether the order was sustained by substantial evidence; and (3) whether the Postmaster General was an indispensable party to the injunction suit.

██ We think the insistence that the District Court should not have supported its findings by evidence other than that presented by the administrative record is correct [see Tagg Bros. et al. v. United States et al., 280 U.S. 420, 444, 50 S.Ct. 220, 74 L.Ed. 524] but the conclusive answer is that the court's findings of fact and conclusions of law clearly demonstrate that they were based upon the evidence before the Solicitor of the Postoffice Department and upon this alone. Further, it should be kept in mind that this is an equity cause wherein the court acts de novo and it will not reverse a decree because of the admission of incompetent evidence if there is substantial evidence to support it.

Upon the question whether the order was sustained by substantial evidence, our review will be limited to that evidence before the Acting Postmaster General upon which the court based its decision. Pertinent portions of the statutes involved are printed.[1,2]

The appellee Company was in the business of manufacturing and marketing an inhaling compound and device for its use. The compound was mixed by its president, S. S. Shackelton, from the following ingredients, "Oil of Pine Needles, Balsam Peru, Balsam Tolu, Gum Benzoin, Pine Tar, Gum Camphor, Terebene, Eucalyptol, Methyl Salicylate, Vegetable coloring and pure grain alcohol as the base or solvent." The compound was used in an inhaler device by means of which air was drawn through the compound and delivered as medicated vapor into the throat or nasal passages of the user and was recommended for use in respiratory ailments.

The business was started in 1881 by Dr. C. A. Shackelton and was carried on for many years without the aid of advertising. It was incorporated in 1940 and appellee began to advertise in some fifteen periodicals. These advertisements were followed up with a booklet and a series of form letters. Ninety-five per cent of the business came through mail orders. The inhaler and compound sold for $3.00 and a refill of the compound for $2.00.

In the show cause order, issued preliminarily to the hearing before the Solicitor of the Postoffice Department, it was alleged that appellee in obtaining and attempting to obtain remittances through the mails from divers persons for its inhaler and preparation, represented and promised in advertisements and in written and printed matter sent through the mails, that the compound used with the inhaler would "relieve and overcome colds, hay fever, asthma, sinusitis, catarrh and all other diseases and impairments of the respiratory tract"; that it would "prevent colds * * * inhibit the development of germs, and prevent such organisms from spreading * * *"; that it is "a proper and effective substitute for change of climate when such change is essential in cases of respiratory disorders"; that it "will enable all users to obtain the same benefits as those reported in alleged testimonials published in the sales literature of said concern, and completely cure and overcome sinus distress, head noises, headaches, coughs, sore throat, bronchitis, hay fever, asthma, and catarrh. Whereas, in truth and in fact, as said concern well knew, said device and compound will not and cannot accomplish the results aforesaid, but all of the said pretenses, representations and promises are false and fraudulent."

The Solicitor in his "Memorandum for the Postmaster General embodying a finding of fact and recommending the issuance of a fraud order" relied upon a typical advertisement, certain excerpts and testi-

[1] "Sec. 259. Mail of persons conducting lotteries or fraudulent schemes returned * * *. The Postmaster General may, upon evidence satisfactory to him * * * that any person or company is conducting any * * * scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations, or promises, instruct postmasters at any postoffice at which registered letters or any other letters or mail matter arrive directed to any such person or company * * * to return all such mail matter to the postmaster at the office at which it was originally mailed, with the word 'Fraudulent' plainly written or stamped upon the outside thereof * * *."

[2] Sec. 732 describes the offense in wording identical to the portions quoted from Sec. 259; and forbids the payment of postal money orders drawn to the order of such companies.

monials appearing in the advertising booklet, upon a certain test letter sent out by an inspector to the Company and the response thereto, upon an analysis of the compound by a chemist of the Food and Drug Administration of the Federal Security Administration, and upon medical testimony of one doctor regarding the symptoms, causes and treatment of certain diseases of the upper respiratory tract, and the probable effect of the use of the inhalant upon those diseases for which it was recommended.

The Acting Postmaster General based the order complained of upon the evidence set forth in the above memorandum. The order itself sets out that it is based upon "evidence being more fully described in the memorandum of the Solicitor for the Postoffice Department."

■ The power of a court of equity to review the order is limited. It extends no further than to determine whether there is substantial evidence in fact, as distinguished from opinion, to support the order. If there is, the case is foreclosed against appellee. If there is not, it follows that appellee has suffered irreparable injury to its property rights. American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90; see also Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092.

With this approach, we consider the evidence.

The memorandum includes the following advertisement:

"Do YOU suffer from HAY FEVER, ASTHMA or SINUS DISTRESS? Then learn how you can obtain relief through breathing PINE AIR IN YOUR HOME by means of the SHACKELTON Inhaler. Sold for 50 years.

Cut of a woman breathing through the inhaler

This ingenious device—neither a dropper, spray, nor atomizer, but a true Inhaler—enables you to breathe Pine-Balsam Vapor deep into your upper respiratory passages. It covers the membranes of air surfaces with a soothing, medicinal film assisting nature in its mission of healing. Compact, convenient, you can carry it with you throughout the day using as frequently as desired. A generous bottle of Inhalant Compound is provided with the Inhaler. This Compound copies nature's own remedy—the invigorating breath of northern pine and balsam for-

ests. It contains no harmful or habit forming drugs. It is what its name implies—a pine-balsam aromatic Compound.

"Offered on a Strictly Money-Back Guarantee SHACKELTON Inhaler and liquid Compound is offered on a result or money-back basis. Try it one week. If you are not satisfied, and you are the sole judge, return the Inhaler and the remaining fluid and your money will be promptly refunded.

"Send for free booklet—'Breathe Pine Air in Your Home.'"

The memorandum also included excerpts from the booklet sent to those responding to the advertisement of which the following are samples:

"May we urge you to read this booklet very carefully? It contains information which should be of unusual interest to you —explaining, as it does, just why the Shackelton Inhaler and Inhalant Compound should likewise relieve your particular condition.

&ast; &ast; &ast; &ast; &ast; &ast;

"You have doubtless noted in our booklet what gratified users have reported the Shackelton Inhaler has done for them. Surely there seems no good reason why it should not do as much for you. And, if it does, that $3.00 is one of the greatest health investments you have ever made.

&ast; &ast; &ast; &ast; &ast; &ast;

BREATHE
PINE AIR
in your
HOME

&ast; &ast; &ast; &ast; &ast; &ast;

"By means of this unique Inhaler, a wholesome Compound delightfully reminiscent of the exhilerating (sic) fragrance of spicy pine needles and sweet smelling balsam boughs, is now economically and easily available for you right in your own home.

"&ast; &ast; &ast; Primarily designed as a defensive measure against contagion, because of certain active antiseptic elements in the Shackelton Compound, this remedy based on reports from countless users, has long indicated an ability to materially inhibit (restrict or discourage) the further spread of such surface organisms as already may be present. The importance of taking rigid precaution when such insidious dangers as head colds or flu threaten—can hardly be overemphasized.

&ast; &ast; &ast; &ast; &ast; &ast;

"A few words regarding various disorders so that you may more readily understand why this long-tried Compound mix-

ture, of well known ingredients, applied in a finely vaporized form directly to ailing mucous surfaces, working in harmony with nature, may thereby materially assist in restoring weakened or impoverished breathing organs to more rational functioning."

Following these excerpts were discussions of the causes and symptoms of various ailments, such as catarrh, sinus disturbances, hay fever and asthma. Then the following:

"One may readily appreciate just why the analgesic principle associated with the Shackelton Compound vaporized solution, contacting tightened membrane passages with a subtle easing influence, suggests itself as an excellent palliative (relief) in the event of this symptomatic complaint.

\* \* \* \* \* \*

"Plain detailed directions for easy use of the Inhaler accompany each outfit. Ensuing pages list a few average examples of a vast accumulation of friendly, unsolicited letters from grateful individuals, endorsing this time honored, convenient means of self-medication and home care of indicated respiratory disturbances. If you will but try this product for your own satisfaction, we feel certain you, too, will share their enthusiasm. Those who consistently use their Inhaler a few minutes each day assure us they find it a surprising effective (sic) prophylactic (preventive) aid in easing or heading off altogether distressing head colds often so prevalent during summer as well as winter months. 'An ounce of prevention \* \* \* is better than a pound of cure,' and eternal vigilance the price of victory."

The following quotations, taken from the testimonial letters, also appeared in the pamphlet:

"I am hard of hearing, but when I use the Inhaler it relieves that head noise and clears my head.

"For one thing I find that it affords me quick relief when I have colds in either my head or throat.

"Some one told me about the Shackelton Inhaler and I decided to try it. \* \* \* Winter is practically over and there has been absolutely no recurrence of my sinus irritation.

"After having suffered from hay fever eight months out of the year you can well understand my enthusiasm over your Inhaler when I got my first night's rest in five months after using same just one day.

"I used your Inhaler in hay fever. Your remedy provided me with relief right from the start, which proved to be permanent. I haven't had hay fever since the first summer I used your Inhaler.

"It put an end to my sinus, head and throat misery.

"I always keep some on hand for if used the first day a cold disappears entirely or is very light.

"I find your Inhaler a most effective preventive and relief for head colds.

"It has been put to good use in our home for many years, and has prevented much suffering from coughs and colds."

Additional evidence included an analysis of the compound and the opinion of a doctor, based on an incomplete statement to him of the analysis, that although the substances in the preparation were well known and had been used by physicians for a long time, they did not appear in the preparation in sufficient volume to have any germicidal effect, could give only temporary relief to nasal symptoms in some instances, and none in others, and that the alleged satisfactory results described in the testimonials to the use of the preparation could not be directly attributed to it, since so many other factors entered into each case.

■ We think the decree should be upheld.

Appellee's business had existed for fifty years on its own merits. It had elicited favorable and unsolicited testimonials from numerous people of unchallenged probity. Throughout its advertising occurred such words and phrases as "palliative," "easing," "relieve," "may \* \* \* assist." There was the assertion that nearly everybody who used it found some aid, but no claim that it would cure deep-seated ailments. Prominently in all its advertising and letters was the money-back guarantee, an implicit reservation that the remedy did not, could not, reach all cases. That it did reach many is undisputed from the testimonials. There was no challenge to the truth of the testimonials except the testimony of a physician, reasoning from a theoretical and incomplete knowledge of the compound, that doctors would have used greater quantities of the drugs, and

would never have employed the compound as the sole method of treatment.

We find nothing in the Anjon correspondence to warrant a different conclusion. One test letter concluded, "If your treatment can completely relieve me of this asthma, send it for the $3 enclosed" and the Company sent a bottle in response. We find no representation here that the inhalant was a cure for asthma. The Company had faith in its product with reason; and Anjon was obviously an unlettered person, desperate for aid. Accompanying the shipment was a pamphlet saying, "We do not say that this remedy will effect perfect results in every case—only impostors make such claims."

There is no substantial evidence that the advertisements, pamphlets and letters could raise hopes of a cure-all panacea. See Leach v. Carlile, 258 U.S. 138, 42 S.Ct. 227, 66 L.Ed. 511. There is nothing that discloses a scheme or stratagem to take money with fraudulent misrepresentation. The inescapable intendment of these advertisements was that appellee was offering a medicinal compound and apparatus which in many cases had given helpful results and that it might not do it in every case was highlighted by the money-back guarantee.

The weakness of an opposite conclusion appears in that part of the Solicitor's memorandum, which attached importance to the pamphlet heading, "Inhaler works perfectly." The paragraph so obviously referred to the mechanical or hydraulic working of the inhaling device, we do not see how any one could seriously confuse the term with the curative properties of the compound. Again, an inherent weakness of the memorandum is found in the suggestion, seriously offered, that it was claimed the vapor inhaled from the compound was a "substitute for a change in climate."

■ We think that the principal question here is, whether the Postmaster General was an indispensable party to the suit. Appellant insists that he was and bases his contention upon the equitable doctrine that all persons who are so interested in the subject matter of a suit and the relief granted that their rights or duties might be affected by the decree, are indispensable and shall be made parties. If this principle prevails, appellant's motion to dismiss, raised early in the hearing, should have been sustained, because the Postmaster General who promulgated the fraud order was directly interested in having the question of its validity determined.

The point is beclouded with doubt, and diversity of judicial opinion. In two cases, Gnerich v. Rutter, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068, and Webster v. Fall, 266 U.S. 507, 45 S.Ct. 148, 69 L.Ed. 411, the court, with reference to the question as to whether a superior is an indispensable party to a suit against a local officer, held that he was. In one case, State of Colorado v. Toll, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927, the court held that he was not; and in Brooks v. Dewar, 313 U.S. 354, 61 S.Ct. 979, 981, 85 L.Ed. 1399, the court, discussing the same question, said:

"As this Court remarked nearly sixty years ago respecting questions of this kind, they 'have rarely been free from difficulty' and it is not 'an easy matter to reconcile all the decisions of the court in this class of cases.' The statement applies with equal force at this date. We are not disposed to attempt a critique of the authorities."

In National Conference on Legalizing Lotteries v. Goldman, 2 Cir., 85 F.2d 66, 67, a mail fraud case similar to the one before us, the court commented upon the question and said that the law is "not as clear as one might wish" but decided that the Postmaster General was an indispensable party. In support of its conclusion the court said:

"A subordinate may therefore for a long time find himself in real embarrassment, in a cross-fire to which equity will not ordinarily expose a suitor, as the whole law of interpleader bears witness. This, at any rate, is the only reason we have been able to conjure up."

In Yarnell v. Hillsborough Packing Co., 5 Cir., 70 F.2d 435, 92 A.L.R. 1475; Ryan v. Amazon Petroleum Corp., 5 Cir., 71 F.2d 1; and Rood v. Goodman, 5 Cir., 83 F.2d 28, the court expressly held that the superior officer was not a necessary party to the suit.

■ The task of harmonizing these decisions is almost, if not altogether, impossible, and following the lead of Brooks v. Dewar, supra, we are reluctant to undertake it. We are content to decide the question upon the record before us. We have already stated the general rule. The rule grew out of the age-old maxim of equity jurisdiction, i. e., "Equity delights to do

122

complete justice and not by halves." The maxim sprang in turn from the desire of the early chancery courts to determine all matters involved in the litigation so that no roots of controversy would remain out of which other suits might spring. To accomplish this purpose, the courts required that all persons interested in the subject matter of the suit should be made parties so that its decree would bind them all. But courts of equity observe general rules only to the extent to which they contribute to the attainment of justice. They do not adhere to any rule which would defeat justice and thus destroy the very purpose for which they were created. Pomeroy's Eq. Jurispr., 4th Ed., Vol. I, § 60; Story's Eq.Pl., 8th Ed., § 135a; Birdsong v. Birdsong, 39 Tenn. 289, 301.

How stands the case here?

█ We think appellee has made out its case. Upon the record it was conducting a lawful business. The fraud order was void as a matter of law. Appellant was excluding appellee from the use of the mails without authority. He was destroying appellee's mail order business, which was ninety-five percent of the whole. He was almost, if not altogether, a trespasser upon appellee's rights and privileges. It is true enough that he was not wilfully committing a wrong. Be it said to his credit, that he was only obeying orders, but he was acting unlawfully and the effect was the same. A stronger case for injunctive relief can hardly be stated. The Postmaster General did not seek to intervene. If he had done so, he would have been bound upon the question of the validity of the fraud order upon the record as made, just as we have indicated appellee was bound by it.

Under these circumstances what course should the District Judge, sitting as a Chancellor, have pursued? Should he have turned appellee out of court and sent it to Washington for a second contest over the same matter? The dismissal of the bill would have been disastrous to appellee and the expense incident to new litigation hundreds of miles from home would have been equally crushing because its business, grossing only a few thousand dollars a year, would have been burdened with the extra expense of the new litigation. The District Judge made the injunction final and we think that this was right. It would have been unjust and inequitable to have dismissed the bill for no other or better reason than adherence to a formal, and what we regard as an inapplicable, rule of equity pleading.

Courts of equity have always struggled against technical rules which impede rather than contribute to substantial justice. We do not anticipate that the decree will result in a "cross-fire" between appellant and the Postmaster General, but in such event, the time to determine that controversy will be when it develops.

Affirmed.