## UNITED STATES of America, Libellant,

v.

An Article of Device Consisting of 24 DEVICES, MORE OR LESS, Individually Cartoned and Labeled in part: (Device) "* * * SUNFLO FLOWING AIR PURIFIER" (Leaflet in Carton) "The Amazing New Sunflo Flowing Air Purifier" and including two Display Cards Reading in Part: "* * * Asthma, Sinus, Hay Fever Relief * * * Sunflo * * *" Which Display Cards Accompany Said Article and Contain Statements Relating Thereto, Respondent-Claimant.

### Civ. A. No. 1007–59.

United States District Court
D. New Jersey.

Feb. 20, 1962.

David M. Satz, Jr., U. S. Atty., by Jerome D. Schwitzer, Asst. U. S. Atty., Newark, N. J., and William Goodrich, Gen. Counsel, Dept. of Health, Education and Welfare, Food and Drug Administration, Washington, D. C., by William R. Risteau, Washington, D. C. (Illinois Bar), for the Government.

Bass & Friend, by Milton Bass, New York City, for respondent-claimant.

WORTENDYKE, District Judge.

In this seizure action under Section 304 of the Food, Drug and Cosmetic Act, 21 U.S.C.A. § 334, the issue presented is whether the seized devices of claimant are misbranded, as defined in 21 U.S.C.A. § 352, by reason of false and misleading statements contained in their labeling respecting their efficacy for the treatment of human diseases or relief from their symptoms. Each of the devices was shipped in interstate commerce prior to seizure and was packaged in a carton containing leaflets entitled "The Amazing New Sunflo Flowing Air Purifier". Placards bearing the legend "New Scientific Aid for Symptomatic Asthma, Sinus, Hay Fever Relief" were displayed in retail stores offering the device for sale after shipment. The libel of information charges that the printed matter accompanying each device represented that it is an adequate and effective treatment for relieving allergies, asthma, simple coughs, sinus colds, virus infection, hay fever, sinus congestion, and irritation of the respiratory tract; also that the

device affords drugless relief from respiratory ills and helps to reduce the spread of air-borne disease germs by producing "ionized air" to relieve the discomforts of respiratory conditions.

While claimant concedes that the leaflets and display cards describing and purporting to explain the functions of the device constitute labeling, Kordel v. United States, 1948, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52; United States v. Lee, 7 Cir. 1942, 131 F.2d 464, 143 A.L.R. 1451, claimant emphatically denies that such labeling contains the representations charged in the libel, and insists that the statements which are contained in the labeling are not false. Claimant asserts that the device affords palliative relief from the breathing stress and breathing discomforts associated with such conditions or diseases as are therein enumerated; i. e., that the user of the device "may enjoy new comfort and palliative relief from breathing discomforts which are due to allergies, asthma, simple coughs, colds and virus infection, hay fever, sinus congestion, and simple irritation of the mucous membrane lining the respiratory tract." Mitigation of the symptoms is not the equivalent of cure or arrest of a disease; but relief from breathing discomforts associated with the specific respiratory diseases enumerated in the labeling may create the impression in the lay mind that the device is represented to be a remedy or cure for a particular disease. See D. D. D. Corporation v. Federal Trade Commission, 7 Cir. 1942, 125 F.2d 679; Aronberg v. Federal Trade Commission, 7 Cir. 1942, 132 F.2d 165; Rhodes Pharmacal Co. v. Federal Trade Commission, 7 Cir. 1953, 208 F.2d 382, rev'd 1955, 348 U.S. 940, 75 S.Ct. 361, 99 L.Ed. 736.

The device in question consists of a cabinet or box, approximately the size and shape of a table radio, which contains a small electric motor-driven fan by means of which air is drawn through a filter forming the rear wall of the box and is exhausted through the front grilled face of the cabinet into the ambient air. In its passage through the box, some of the air is exposed to ultra-violet rays emitted by two electric bulbs contained in the device. The components of the device are alleged to perform, in combination, the following functions: The filter forming the rear wall of the box removes pollen, other air-borne allergens, and dust from the air. The ultra-violet light within the box kills bacteria and viruses in the air which passes by and around the bulbs, by creating ozone in that air. The alleged negative ionization of the air, in combination with the ozone produced by the ultra-violet lamps, is claimed to have a bactericidal effect upon air-borne germs.

There was evidence that air flows through the device at the rate of 41.5 cubic feet per minute, according to measurements made by a pitot tube in conjunction with a pressure-measuring device and a thermocouple anemometer. The average arrestance of dust achieved by the filter was 14.6%. Ragweed pollen penetrated the device to the extent of manifesting its presence microscopically on the downstream surface of the front grille. Tobacco smoke passed freely through the device, and the reduction of particulate matter in a room with a volume of 1800 cubic feet was obtained only to the degree of 17% of the concentration to be found in a room of similar volume in which no such device was operated. For the purpose ·of determining the efficacy of the device for the removal of dirt from the air, two experiments were performed; one for a period of 41 hours, and the other for a period of 16 hours. Three similar, in-line office rooms were selected, and two air samplers were placed in the center room, with glass tubes connecting the samplers with the end rooms, and extending through the dividing walls separating the room in which the samplers were located from the end rooms. One of the end rooms contained an operating Sunflo device; the other, none. All of the rooms were unoccupied for practically the entire period of the test. The doors and windows were closed and locked, and no air conditioner was functioning there-

in. The air was drawn from the control room and from the test room through the air samplers, and the particulate matter in the air was deposited on paper tape in each sampler, causing spots of discoloration thereon. The density of each spot reflected the quantity of dirt collected in one hour of time. The spots on these tapes were evaluated by determining the quantity of light transmitted through them, as indicating the amount of the particulate matter suspended in the air of the test room and of the control room. The value of each spot was graphed and graphs for the test and control rooms were prepared. It was found that there was no significant difference in the amount of dust suspended in each of the rooms compared.

The ultra-violet emission rate of the Sunflo lamps was found to be 43 and 11 microwatts per square centimeter, at distances of six inches and one foot respectively. The device was found to deliver approximately 250,000,000 negative ions per second, or 13,000 negative charges per cubic centimeter at the front grille, and 400 to 500 negative charges per cubic centimeter at a distance of six feet in front of the grille.

A medical specialist in allergies expressed the opinion that an air filter, if interposed between a source of air-borne allergens and an asthma sufferer, might reduce his exposure to the allergens in proportion to the efficiency of the filter, provided that the patient were otherwise insulated from the source of the allergens. Such insulation is impossible in the case of ambient room dust. A reduction of particulate matter in a room to the extent of only 17% would not, in the opinion of the Government's medical expert, accomplish a noticeable diminution of symptoms resulting from the presence of air-borne allergens. Therefore, the device would be of little value in the treatment of a sufferer from ragweed allergy. Cardiac asthma would obviously not respond to treatment by the use of the device, and such a disease might become progressively worse if the device were solely relied upon for its treatment. Breathing discomforts due to colds or virus infections would also fail to respond to the use of the device; although coughs and sinus congestion, due to filterable particulate matter in the air, might be relieved in some degree. The ultra-violet radiation and its ozone product has little, if any destructive effect on air-borne micro-organisms. Allergies due to infection, or resulting from ingestion of food, would not respond to the use of an air filter. Because of its limited capacity to arrest ragweed pollen, and its retention of only 14% of particulate matter from air passing through its filter, the device is ineffective for the treatment of allergies due to inhalation of air-borne allergens. Only three out of every ten cases of asthma are of allergic origin. The filtration feature of the device, therefore, is of little utility for treatment in the majority of asthma cases. Excepting cases of sinus congestion caused by air-borne allergens, the device is not effective in the treatment of coughs, colds, virus infections, or sinus difficulties. The negative ions which are said to be produced by the device, are ineffective in the treatment of respiratory diseases.

In efforts to refute the authoritative opinions of the six amply qualified expert medical and scientific witnesses for the Government, claimant called two witnesses. One of the latter was the designer of the device in question; the other a general medical practitioner, whose testimony was based upon unscientific procedures and hearsay information.

A large part of the testimony given by the designer of the device was critical of the testing techniques used and contradictory of the opinions expressed by the Government witnesses. Affirmatively, he testified that the device consisted of a filter, comprised of flocked nylon fibers, through which the air is drawn into the device. The openings in the grille, which forms the front of the device, are so designed and arranged as to aid in the diffusion of the discharging air to enhance the over-all efficiency of the unit.

The two ultra-violet lamps within the shell of the device are said to emit ultra-violet rays of 1849 and 2537 wave lengths, and are partially surrounded by a special metallic shield upon which the emitted rays impinge. The designer also claimed that a static electric charge, positive in nature, equivalent to 60 volts, is induced on the nylon filter by the passage of the air through the same at a velocity of approximately 200 feet per minute, in atmospheres of from forty to eighty-five percent relative humidity. He further testified that the device is constructed so that it can only give off negative charges of electricity. This is accomplished by means of the special metallic plates partially surrounding the ultra-violet lamps. The bulbs of these lamps are designed and manufactured by Westinghouse Electric Manufacturing Company, and are known by its catalogue number 794H. The thickness of the glass envelopes of these lamps, in combination with the chemical composition of the bulbs, is said to create a high angstrom measure of radiation. It is the contention of the claimant that the ultra-violet lamps in the device perform three major functions: (1) they produce a small amount of ozone, the effect of which is to deodorize, and to kill bacteria and virus in the air; (2) the effect of the ultra-violet emission is bactericidal or germicidal, by reason of its wave lengths; and (3) the ultra-violet emission is the principal productive source of the negative ions in the air as it flows through the unit. In addition to these features, claimant says that the so-called ion grilles are coated with graphite to counteract the fatigue effect from photoelectric ion production; i. e., to offset its diminishing ion-producing capacity. A grid leak is attached to the plate which grounds out its positive charge and renders constant the flow of electrons into the plate without impairment of the intensity of their emission. Another feature upon which the claimant predicates its claims of the efficacy of the device is its structural provision for recirculation of the air. It is asserted in this connection that the negative ionization of the air-borne particles and other contaminants enhances the capacity of the positively charged filter to pick them out of the air-stream as it passes through the device. In cases of smoke-laden air, which is said to be positively charged, an attraction is created between the positively charged particles thereof and the negative ions produced by the device, which changes the charge of the smoke particles either to a neutral or to a negative phase. It is contended, therefore, that the recirculation of the smoke particles through the machine, after having been neutrally or negatively charged, enhances the capacity of the positively charged fibers of the filter to attract and hold them. A further theory urged by the claimant is that the emission of negative ions, created within the device, into the outer surrounding air neutralizes positively charged particles in that air, and thereby prevents their mutual repulsion and causes them to agglomerate into larger masses, more readily susceptible of arrest by the filter.

Claimant contends that the efficacy of the device to refresh and deodorize stale air has not been questioned or refuted by any competent evidence adduced in the case. With this contention we agree. However, we recognize that refreshment and deodorization of stale air to the extent resulting from single or even from many passages of the air through the device is neither probative nor conclusive of the efficacy of the device for the therapeutic purposes set forth in the labeling. Assuming the arrestance capacity of the filter, the static charge given to the fibers thereof through the friction of the passage of the air therethrough, the addition of the ozone resulting from the ultra-violet light emissions, and the ionization of the air in its transit through the device, these factors do not, either singly or in combination, serve to render the device efficacious as "an adequate and effective treatment for relieveing allergies, asthma, simple coughs, sinus colds, virus infection, hay fever, sinus congestions and

irritation of the respiratory tract" or to relieve respiratory ills or inhibit the spread of air-borne disease germs. To relieve is to free wholly or partly from something painful or disagreeable, or from its effects.

■ The Court takes judicial notice of the fact that atmospheric air contains particulate matter and serves as a carrier of bacteria. To the extent that a given volume of such air is drawn through a nylon filter, some, at least, of the particulate matter is screened from that air. As this screened air is then passed through ultra-violet rays, it is sterilized to a degree and its bacteria count is reduced. Doubtless the air screen with which we are immediately concerned becomes negatively ionized. When the stream of air emerges from the device, after passage through it and into the circumambient air, there is no means by which the molecules of the volume of air which has passed through the device can be channeled or confined so as to be protected from contamination by contact with the surrounding atmosphere. The emission of a volume of air from the front of the device permits immediate diffusion of the molecules of that volume throughout the entire air space within the area in which the device is operating and no means are provided for recirculating, on a second trip through the device, the same air which had previously passed through it. Therefore, the theory of agglomeration of particulate matter and bacteria as a result of the electrical charges conferred or transferred by the passage of a given volume of air through the device, and the consequent improvement of the arrestance afforded by the filter upon the next round of the travel of these agglomerated contaminants, is illusory. The patient sufferer from one or more of the diseases mentioned in the labeling is thus unjustifiably induced, by the representations therein, to hope that, if the device operates long enough, and adverse and intruding atmospheric currents permit, the air volume in the room will ultimately become purer and safer for him to inhale. There was no reliable evidence in the case from which a reasonable inference could be drawn that the operation of claimant's device at a particular location, within a given volume of air space, for any specific period of time, would have any alleviative or therapeutic effect upon an individual occupying that air space, who might be suffering from one or more of the ills named in the labeling here considered.

Assuming that the seized device is therapeutically inefficacious, does the evidence support the libelant's contention that the labeling is false or misleading in its representation that sufferers from the ailments named would be induced to buy and use the device in efforts to secure relief from the effects of those diseases? Claimant would answer this question in the negative, upon the authority of D. D. D. Corp. v. Federal Trade Commission, supra; Jarvis v. Shackelton Inhaler Co., 6 Cir. 1943, 136 F.2d 116; and Rhodes Pharmacal Co. v. Federal Trade Commission, supra. In D. D. D. Corp., the Federal Trade Commission's order found false and misleading the advertising of the proprietor's external liquid applications as effective relief for itching. The Court of Appeals (per Major, C. J.) stated (125 F.2d p. 682): "We see no reason why petitioner should not be permitted to represent its product as a relief for itching. It does not cure either the itch or its cause, but it does afford relief. * * * The words 'relief from itching' could, in our minds, carry no implication to the public that the product was a permanent cure either for the symptom or the disease."

In Jarvis the Court of Appeals affirmed the District Court in enjoining a local postmaster from obeying a fraud order of the Acting Postmaster General. The advertising material there involved represented that the proprietor's medicinal compound and apparatus had proven helpful as a palliative, relief and assistance in cases of colds, sinus irritations, and hay fever, and contained a "money-back" guarantee. It was not represented as a

cure-all panacea. It was conceded that it was not invariably efficacious.

The Rhodes Pharmacal case affirmed the Federal Trade Commission's cease-and-desist order by a finding that although the proprietor's product afforded (208 F.2d p. 388): "relief for the pain and discomfort incident to many rheumatic and arthritic conditions" and "[t]he duration of time that such relief was afforded differed with the individuals who used" it, the product would not furnish permanent relief or effect a cure of rheumatic or arthritic conditions. The Court modified the Commission's order to enjoin representations that the product would afford permanent rather than any relief from the discomforts of the named ills.

Proprietor's contention that his product was advertised not as a remedy but as providing relief from delayed menstruation did not enable him to withstand the Commission's order in Aronberg v. Federal Trade Commission, supra, because, as the Court said, (132 F.2d p. 168): "The term 'relief' is not of definite connotation or entirely free from ambiguity; in a common sense, it connotes permanent removal of organic or functional disturbances, as distinguished from alleviation of discomfort." The Court found (132 F.2d p. 169), that "[t]he consensus of the expert testimony was that petitioner's preparations are not competent, safe, or reliable as a relief for delayed menstruation because of the heavy dosage of drugs contained in each capsule."

The representations in the present case which the Government criticizes as false and misleading are to be found in the leaflet entitled "The Amazing New Sunflo Flowing Air Purifier" and in the display card entitled "New Scientific Aid for Symptomatic Asthma, Sinus, Hay Fever Relief" previously herein referred to. The leaflet purports to explain how the user may enjoy new comfort and palliative relief from breathing discomforts due to allergies, asthma, simple coughs, colds and sinus infection, hay fever, sinus congestion and simple irritation of the mucous membrance lining the respiratory tract (including nose, throat and bronchi). The leaflet claims four potentials for the device: (1) promotion of helpful palliative relief of certain asthma and hay fever symptoms, such as sneezing and associated breathing difficulty, achieved by the filtering out of allergens, pollens, soot, dust, dirt, and other contaminants whereby the sufferer is caused to "feel better fast" and enabled to breathe more easily in consequence of the removal of irritants that constantly aggravate swollen membranes; (2) production of "ionized" air which, when inhaled, may be influential in shrinking swollen membranes of respiratory passages, and may aid in speeding recovery from cold or virus symptoms and in protecting from infection by airborne disease germs; (3) compensation for electron deficiency in ambient air through its enrichment by the ionization of the air flowing from the device; and (4) deodorization of the ambient air and destruction of viruses and other air-borne germs therein by means of ozone produced by the two ultra-violet bulbs within the device. In sum, it is claimed that the device affords palliative relief from symptoms of various diseases, aids in shrinking swollen membranes of respiratory passages, compensates for electron deficiencies in the air, and serves to deodorize the air and destroy virus and other air-borne germs therein. The display card represents that the device affords effective relief from breathing distress due to allergies, asthma, simple coughs and colds, sinus, hay fever or air-borne irritants. It is stated that the device produces, for inhalation by the sufferer, healthful ionized air almost completely free of air-borne allergens, dust carried bacteria, pollen, and impurities. The resulting electron-enriched air is said to promote quick, palliative, drugless relief from the respiratory ailments above mentioned, by aiding the lungs and throat in clearing themselves from congestion and foreign matter and relieving bronchial asthma spasms. "Ionized air" as used in the advertisement is

therein defined as air which is electronically treated by ultra-violet sun-tubes in the device, so that the air becomes revitalized and energized. In the proprietor's language, "In go dust, germs, pollen, odors, allergens, and other irritants \* \* \* OUT comes the pure, safe, fresh and beneficial kind of air you should breathe—plus an increased supply of 'activated oxygen' that promotes immediate, pleasant relief with every breath you take. \* \* \* It purifies as it filters as it deodorizes as it recirculates a whole roomful of enriched, healthier-to-breathe air every few minutes."

The Court finds that the seized device is harmless, *per se*; and that it filters some particulate matter from and reduces, to a degree, the bacteriological and virous content of such air as is drawn into and discharged from the device. No person who had used the device while suffering from any of the diseases mentioned in the labeling testified respecting the effect of the operation of the device upon the discomforts of the sufferer. The presence of ozone in the air discharged from the device is easily perceptible to the olfactory sense when inhaled as it leaves the front grille. No evidence was presented of the effect of the discharged air upon pervasive odors in the surrounding air. Air-borne smoke passed readily through the device. If, as the claimant contends, air which is discharged from the device is ionized, the evidence preponderates that it is inefficacious to eliminate the symptoms of any of the diseases or conditions mentioned in the labeling. The device does not purify as it filters the air; nor does it deodorize or recirculate a whole roomful of enriched air every few minutes.

The device is misbranded, because its labeling is in some respects false, and in other respects misleading. The device and its labeling are condemned, and an appropriate decree will be entered. However, after entry of such decree, and upon payment of the costs of these proceedings, and execution of bond as provided in 21 U.S.C.A. § 334(d), the seized devices may be delivered to the owner thereof, to be brought into compliance with the provisions of Chapter 9 of Title 21, pursuant to the requirements of said Section.

Submit decree and order accordingly.